# 23-0220-cv

## United States Court of Appeals

### *for the*

## Second Circuit

—————◆◆—————

JORDAN WHITE, ROBERT PARTELLO, ERIN ABDOO, BRIDGET
SALOPEK, OLIVIA BOYER, REBECCA GEORGE, CORINTHEA
PANGELINAN, ELIZABETH AUSTIN, STEPHANIE NORGAARD,
AMANDA SCHRAM, LATOYA MCHENRY, ERICA DOUGLAS,
TABITHA LATTEYER, MORGAN ENGEBRETSEN,

*(For Continuation of Caption See Inside Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**BRIEF FOR PLAINTIFFS-APPELLANTS
AND CONSUL PLAINTIFFS-APPELLANTS**

ERIN GREEN COMITE
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 South Main Street
P.O. Box 192
Colchester, Connecticut 06415
(860) 537-5537

– and –

STEVEN L. BLOCH
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
(203) 325-4491

*Attorneys for Plaintiffs-Appellants and
Consul Plaintiffs-Appellants*

MCGLINCHKALI, AMANDA ROGERS, MAURICE PETERSON, SHEILA
CURRY, KATHERINE MCGIBNEY, NATALIE FRANCOIS, HEATHER
MALAGA, TAMAYA STEVENSON, LIZA SIKE, KARLEEN KOZACZKA,
MAYELIN CARRANZA, ANA BUTKUS, MONIQUE WARREN, CELIA
BRUNO, SAMANTHA CLARK, ELIZABETH MCDOWELL, JILL HAYDEN,
BRANDI SLABINSKI, KELSEY BLANKENSHIP, SAMMI HOBDY, LISA
FISHER, PORSCHE STOKES, MELANIE COLE, KINDER SMITH,
LOUKEVIA MOORE, XENA ALMQUIST, NATHAN EDWARDS, SHAYLAN
ISAACS, ALBACHIARA FARCI, AMBER WRIGHT, CHRISTEN ZULLI,
KRISHNA PATEL, DERRICK CARR, MALIK HOCKADAY, ASHLEY
YATES, CHARITA HARRELL, BRITTANY WALLACE, ANDREW LOHSE,
ADRIANNE COOPER, ALYSSA MEGAN BARB, REBECCA ABBOTT,
CHRISTINA MITCHELL, BRITTNEY MOYER, AMANDA HOLMES,
AMANDA BOOTS, DILLON TOWNZEN, NATALIE WILLIAMS,
CHRISTINA ALLGOOD, AKA Christina Holland,

*Plaintiffs-Appellants,*

JEREMY CANTOR, On behalf of themselves and all others similarly situated,
HEATHER HYDEN, On behalf of themselves and all others similarly situated,
HALEY SAMS, On behalf of themselves and all others similarly situated, VITO
SCAROLA, On behalf of themselves and all others similarly situated, EMILY
BACCARI, On behalf of themselves and all others similarly situated, JILLIAN
GEFFKEN, On behalf of themselves and all others similarly situated,
KAITLYNN CARSON, On behalf of themselves and all others similarly situated,

*Consul Plaintiffs-Appellants,*

LAURIE THOMAS, Individually and on behalf of all others similarly situated,
ALISON KAVULAK, Individually and on behalf of all others similarly situated,
JEN MACLEOD, Individually and on behalf of all others similarly situated,
MARY NARVAEZ, Individually and on behalf of all others similarly situated,
ALISON FLEISSNER, Individually and on behalf of all others similarly situated,
EMILY BIGAOUETTE, Individually and on behalf of all others similarly
situated, LAURA EGGNATZ, Individually and on behalf of all others similarly
situated, TERESA HAGMAIER, Individually and on behalf of all others similarly
situated, NICOLE FALLON, Individually and on behalf of all others similarly
situated,

*Plaintiffs,*

LAURA PEEK, Individually and on Behalf of All Others Similarly Situtated,
ROBYN MOORE, Individually and on Behalf of All Others Similarly Situtated,
GABRIELLE STUVE, Individually and on Behalf of All Others Similarly
Situtated, MATTIA DOYLE, on behalf of himself and all other similarly situated,
LEE BOYD, Individually and on Behalf of All Others Similarly Situtated,
ASHLEY ALLEN, On behalf of themselves and all others similarly situated,
DOMINICK GROSSI, On behalf of themselves and all others similarly situated,
ANTHONY HARRISON, On behalf of themselves and all others similarly
situated, NEISHA DANIELS, On behalf of themselves and all others similarly

situated, HEATHER MCCORMICK, On behalf of themselves and all others similarly situated, HANNAH GRANDT, On behalf of themselves and all others similarly situated, AMBER CAUDILL, On behalf of themselves and all others similarly situated, MICHAEL MOTHERWAY, Individually and on behalf of all others similarly situated, KATHEY HENRY, Individually and on behalf of all others similarly situated, KELSEY GANCARZ, Individually and on behalf of all others similarly situated, ATAHSIA SMILEY, Individually and on behalf of all others similarly situated, NAJAH A. HENRY, Individually and on behalf of all others similarly situated, CHANEL J. JACKSON, Individually and on behalf of all others similarly situated, ALEXIS DIAS, Individually and on behalf of all others similarly situated, HOLLY BUFFINTON, Individually and on behalf of all others similarly situated, CONSTANCE VENABLE, Individually and on behalf of all others similarly situated, TERESA WILSON, individually, and on behalf of all others similarly situated, RYAN SANDERS, individually, and on behalf of all others similarly situated, SUSAN CANADA, individually, and on behalf of all others similarly situated, TABATHA SIDI, individually, and on behalf of all others similarly situated, TIFFANIE SKIBICKI, individually, and on behalf of all others similarly situated, HEATHER AGE, individually, and on behalf of all others similarly situated, JOLINA MANLEY, individually, and on behalf of all others similarly situated, JESSICA DAVID, individually, and on behalf of all others similarly situated, CASSANDRA MARTELL, individually, and on behalf of all others similarly situated, MIESHIA DOUGLAS, individually, and, JESSICA LOGGINS, on Behalf of Herself and All Others Similarly Situated, ANA LYNETTE GREGORY ELDRIDGE, Individually and on behalf of all others similarly situated, EMILY ORSAK, on behalf of themselves and a class of all others similarly situated, JULIE CHATAGNIER, on behalf of themselves and a class of all others similarly situated, MARIE MEZILE, individually and on behalf of all others similarly situated, ALYSSA ROSE, on behalf of themselves and all others similarly situated, MYJORIE PHILIPPE, on behalf of themselves and all others similarly situated, MELISSA SISK, on behalf of themselves and all others similarly situated, VANESSA INOA, on behalf of themselves and all others similarly situated, ASYIA ANDREWS, individually and on behalf of all others similarly situated, STACIA CULLORS, an individual, L. C., through their guardian ad litem Stacia Cullors, V. C., through their guardian ad litem Stacia Cullors, ANTHONY BACANI, an individual, D. B., through their guardian ad litem Anthony Bacani, E. B., through their guardian ad litem Anthony Bacani, JENNIFER CULLORS, an individual, A. C., through their guardian ad litem Jennifer Cullors, J. C., through their guardian ad litem Jennifer Cullors, N. C., through their guardian ad litem Stacia Cullors,

*Consul Plaintiffs,*

— v. —

BEECH-NUT NUTRITION COMPANY,

*Defendant-Appellee.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT ........................................................8

STATEMENT OF ISSUE PRESENTED FOR REVIEW ........................................9

STATEMENT OF THE CASE................................................................9

    A.    Procedural History................................................................9

    B.    Statement of Facts ..............................................................11

    C.    The Decision Below ........................................................23

SUMMARY OF THE ARGUMENT ....................................................24

STANDARD OF REVIEW ..................................................................26

ARGUMENT ......................................................................................27

I.    The District Court Erred in Invoking the Primary Jurisdiction Doctrine Because Future FDA Recommendations as to Heavy Metal Action Levels Will Not Materially Aid the Court in Determining Whether Beech-Nut Deceived Consumers and No Risk of Inconsistent Decisions Exists............27

    A.    The Primary Jurisdiction Doctrine Is Narrow in Scope ......................27

    B.    None of the *Ellis* Factors Supports Deference to the FDA ................28

CONCLUSION ..................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016) ...............................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................26, 48

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....................................................31, 34

*Berkshire Bank v. Lloyds Banking Grp. Plc*,
No. 20-1987-CV, 2022 WL 569819 (2d Cir. Feb. 25, 2022) ............................27

*Clinger v. Edgewell Pers. Care Brands, LLC*,
No. 3:21-CV-1040, 2023 WL 2477499 (D. Conn. Mar. 13, 2023).............41, 48

*de Lacour v. Colgate-Palmolive Co.*,
No. 16-CV-8364, 2017 WL 6550690 (S.D.N.Y. Dec. 22, 2017)......................45

*Elkind v. Revlon Consumer Prods. Corp.*,
No. 14-cv-2484, 2015 WL 2344134 (E.D.N.Y. May 14, 2015) .................40, 45

*Ellis v. Trib. Television Co.*,
443 F.3d 71 (2d Cir. 2006) ........................................................*passim*

*Garber v. Legg Mason, Inc.*,
347 F. App'x 665 (2d Cir. 2009) ....................................................14

*Gavilanes v. Gerber Prods. Co.*,
No. 1:20-cv-05558, 2021 WL 5052896 (E.D.N.Y Nov. 1, 2021)
................................................................42, 43, 47, 48

*Global Crossing Bandwidth, Inc., v. OLS, Inc.*,
No. 05-cv-6423L, 2009 WL 763483 (W.D.N.Y. Mar. 19, 2009) ...............27, 50

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
8 F. Supp. 3d 467 (S.D.N.Y. 2014) ...................................................45

*Goya Foods, Inc. v. Tropicana Prods., Inc*.,
    846 F.2d 848 (2d Cir. 1988) ...............................................................................27

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001) ...............................................................................27

*Hasemann v. Gerber Prods. Co*.,
    No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016) .....................43

*In re Beech-Nut Nutrition Co. Baby Food Litig.*,
    No. 1:21-CV-133, --- F. Supp. 3d ---, 2023 WL 350818 (N.D.N.Y.
    Jan. 19, 2023) ...............................................................................11, 12

*In re Edgewell Pers. Care Litig*.,
    No. 16-cv-3371, 2018 WL 7858623 (E.D.N.Y. Sept. 4, 2018) ..................*passim*

*In re Frito-Lay N. Am., Inc. All Nat. Litig*.,
    No. 12-MD-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .....................40

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig*.,
    No. 1:21-cv-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ...............*passim*

*In re Plum Baby Food Litig*.,
    No. 4:21-CV-00913, 2023 WL 3493319 (N.D. Cal. May 3, 2023) ...........*passim*

*Kimca v. Sprout Foods, Inc.*,
    No. BER-L-002538-22, 2022 WL 3586095 (N.J. Super. Ct. Law.
    Div. Aug. 17, 2022) ...............................................................7, 24, 29, 34

*McNulty v. Polar Corp*.,
    No. 19 CIV. 8903 (LGS), 2020 WL 5658667 (S.D.N.Y. Sept. 23,
    2020) ...............................................................................................42

*Nat'l Commc'ns. Ass'n, Inc. v. Am. Tel. & Tel. Co.*,
    46 F.3d 220 (2d Cir. 1995) .................................................................26, 28, 47

*Palmer v. Amazon.com, Inc*.,
    51 F.4th 491 (2d Cir. 2022) ...........................................................26, 30, 44, 45

*Petrosino v. Stearn's Prods., Inc*.,
    No. 16-CV-7735, 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018).....................42

*Porrazzo v. Bumble Bee Foods, LLC*,
    822 F. Supp. 2d 406 (S.D.N.Y. 2011) ..................................................18, 22, 34

*Silva v. Hornell Brewing Co., Inc.*,
    No. 20-CV-756, 2020 WL 4586394 (E.D.N.Y. Aug. 10, 2020) ...............*passim*

*Soto v. Disney Severance Pay Plan*,
    26 F.4th 114 (2d Cir. 2022) ..................................................................19, 27, 37

*Tassy v. Brunswick Hosp. Ctr., Inc.*,
    296 F.3d 65 (2d Cir. 2002) ..........................................................24, 27, 28, 31

## Statutes and Other Authorities

21 U.S.C.
    § 341....................................................................................................................43

28 U.S.C.
    §1291.....................................................................................................................9
    §1332(d)(2)(A).......................................................................................................8

Fed. R. App. P.
    4.............................................................................................................................9
    26(a)(1)(C) ............................................................................................................9

Fed. R. Evid.
    201(b)(2) ..............................................................................................................14
    201(c) ...................................................................................................................14

*Action Levels for Lead in Food Intended for Babies and Young*
    *Children: Draft Guidance for Industry*, FDA (Jan. 2023) .................................14

*Action Levels for Lead in Juice: Draft Guidance for Industry*, FDA
    (Apr. 2022).........................................................................................................19

*Draft Guidance for Industry, Arsenic in Apple Juice: Action Level*,
    FDA (July 2013) ................................................................................................19

FDA, "Closer to Zero: Reducing Childhood Exposure to
    Contaminants from Foods"..................................................................................46

FDA, "Closer to Zero: Reducing Childhood Exposure to
   Contaminants from Foods" website landing page (current as of
   Mar. 3, 2023)......................................................................................22

FDA, Lead in Food, Foodwares, and Dietary Supplements ....................................37

FDA, FDA Releases Action Plan for Reducing Exposure to Toxic
   Elements from Foods for Babies, Young Children (Apr. 8, 2021) ...................18

*Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance
   for Industry*, FDA (Aug. 2020)...................................................................*passim*

Press Release, FDA, FDA Announces Action Levels for Lead in
   Categories of Processed Baby Foods (Jan. 24, 2023)........................................34

iv

## PRELIMINARY STATEMENT

Consumers, like Plaintiffs-Appellants ("Plaintiffs") and the proposed nationwide class, expect that sellers of baby food regard children's health and safety as paramount when formulating their baby food products, sourcing ingredients, and testing for contaminants and that sellers will be forthright and transparent in their labeling and marketing of those baby food products. Defendant-Appellee Beech-Nut Nutrition Company, Inc. ("Beech-Nut"), which manufactures and sells baby food products throughout the United States, carefully cultivates and aggressively promotes its position of trust with parents and the consuming public, representing that: "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."

In particular, Beech-Nut touts that it has been "testing [its] ingredients for *heavy metals* since 1985" and is "aware of no higher standards in the industry than the ones [it] employ[s]." Specifically with regard to heavy metals, Beech-Nut represents that it:

> test[s] for up to 255 pesticides and heavy metals (like *lead, cadmium, arsenic* and other nasty stuff). Just like you would, we send the produce back if it's not good enough. *Even in the case of our infant rice cereal, which is already below the proposed FDA limit for arsenic in rice cereals, we still test every, single lot to ensure it's safe to consume*.

Of course, Beech-Nut widely promotes its purported stringent standards regarding heavy metals in its products because exposure to these heavy metals (*i.e.*, lead,

arsenic, cadmium, and mercury) indisputably risks harm to babies and young children through accumulated effects. Beech-Nut's marketing is designed to engender the trust of parents and the consuming public. Indeed, Beech-Nut represents that it:

> conduct[s] more than 20 rigorous tests on our delicious purees to ensure that the safety, quality and flavors are just right – before they reach your baby's high chair. So you know that you are feeding your baby only the very best quality. . . . We know moms, dads, and caregivers depend on our commitment to safety and quality to help keep their children thriving.

And, Beech-Nut labels its baby foods as "natural," "organic," and suitable for infants and toddlers of various developmental "stages," and even highlights the beneficial heavy metals in its baby foods – for example, "iron."

Despite Beech-Nut's representations, Beech-Nut's baby food products did not have the qualities and characteristics that Beech-Nut represented to the public because those products contained the very heavy metals for which Beech-Nut purportedly tested to ensure safety and quality, as demonstrated by a Congressional investigation and testing by Alaska's Department of Environmental Health. Faced with these results, Beech-Nut recalled certain rice cereal products because they exceeded the U.S. Food and Drug Administration ("FDA") limit for inorganic arsenic and then, tellingly, *exited the rice cereal market entirely* because Beech-Nut was "concerned about [its] ability to consistently obtain rice flour well below the FDA guidance level and Beech-Nut specifications for naturally occurring inorganic

2

arsenic." This was no inconsequential decision for Beech-Nut given that rice cereal is the most commonly consumed infant instant cereal in the United States. This announcement also confirmed that consumers, like Plaintiffs and the proposed classes, had purchased Beech-Nut rice cereal that contained or risked containing inorganic arsenic at levels exceeding industry standards and guidelines – including those set by Beech-Nut.

The Congressional reporting and other testing also uncovered numerous examples of Beech-Nut baby food ingredients that contained arsenic, lead, and cadmium, including at levels well in excess of applicable or analogous reasonable limits. Significantly, the Congressional reporting revealed that Beech-Nut does ***not*** test its finished products (despite its representation that it tests "every, single lot" of rice cereal), that its food additives tested at elevated levels for arsenic, and that other commonly-used ingredients contained multiple heavy metals in a single ingredient. These findings belie Beech-Nut's representations of industry-leading testing and safety standards in the marketing of its baby food products. Indeed, Congressional reporting highlighted that Beech-Nut set internal guidelines for lead and cadmium that "far surpass any existing regulatory standard" as well as the levels of any other responding baby food manufacturer and that Beech-Nut sold products to the public that exceeded even those comparatively-lax internal limits.

As a result of Beech-Nut's wrongdoing, reasonable consumers, like Plaintiffs and the proposed classes, who trusted Beech-Nut to sell baby food that is healthy, nutritious, safe for consumption, and free from harmful toxins and contaminants, paid for Beech-Nut baby food products that actually contained (or had a material risk of containing) heavy metals, incurring economic harm. Plaintiffs thus brought claims against Beech-Nut for violation of state consumer protection statutes, breach of express and implied warranties, fraud by omission, and unjust enrichment predicated on Beech-Nut's misleading, unfair, and deceptive conduct in labeling and marketing its baby food products.

In response to the Congressional investigation into heavy metals in baby foods and the subsequent public outcry, the FDA announced a years-long, incremental initiative ("Closer to Zero") to study heavy metals in baby foods and publish ***non-binding*** industry guidance – not regulations – regarding so-called "action levels" for heavy metals. Relying on the FDA's Closer to Zero initiative, Beech-Nut moved to dismiss this action on the basis of the primary jurisdiction doctrine (among other grounds), and the district court granted the motion on this basis. The district court erred, however, in dismissing this action in deference to the FDA because Plaintiffs' claims are based on Beech-Nut's misleading, unfair, and deceptive labeling and marketing practices that are well within a court's conventional experience to adjudicate and any expertise the FDA may have would not materially assist the

district court in resolving the factual questions to determine whether specified legal standards have been violated by Beech-Nut in this case.

*First* and foremost, an FDA action level for inorganic arsenic in rice cereal already exists (and has for some time), which Beech-Nut violated, as evidenced by its product recall and exit from the rice cereal market. At a minimum, the district court should not have dismissed Plaintiffs' claims based on their purchases of rice cereal and committed error in doing so.

*Second*, in January 2023, after the district court's ruling, the FDA issued non-binding draft guidance regarding lead in baby foods and expressly stated that the proposed action levels "are not intended to direct consumers in making food choices," and Beech-Nut conceded below that the FDA does not intend in the Closer to Zero initiative to require warning labels or disclosures on baby food products regarding heavy metals. As one district court aptly held in declining to defer to the FDA and apply the primary jurisdiction doctrine to similar claims arising from heavy metals in baby food, the FDA guidance simply "does ***not*** address labeling of baby food products." And district courts within the Second Circuit likewise have declined to apply the doctrine under analogous circumstances where defendants, like Beech-Nut here, contend that the FDA is formulating industry guidance because the FDA's prospective standards, as is true here, would not remedy economic damages for prior labeling practices.

5

***Third***, as Plaintiffs forecasted in the briefing below, the FDA's non-binding guidance under the Closer to Zero initiative is not intended to provide the definitive heavy metal specifications that the district court erroneously perceived would be forthcoming to aid the court in adjudicating Plaintiffs' claims. This was borne out in the initial draft guidance regarding lead in baby food, which set forth suggested, rather than mandatory, action levels and, as the FDA explained, "***do not establish legally enforceable responsibilities***." Even when finalized, the draft guidance will merely "represent the current thinking" of the FDA. "***It does not establish any rights for any person and is not binding on [the] FDA or the public***." At best, the FDA guidance constitutes the type of "expert" advice that the Second Circuit (and other courts) have found lacking in materially assisting courts to determine whether legal standards have been violated.

***Fourth***, courts are instructed to balance the advantages of applying the primary jurisdiction doctrine against the potential costs resulting from complications and delay in the administrative proceedings, and the district court below acknowledged the necessary delay to Plaintiffs' action. Putting aside whether the district court properly engaged in balancing these factors (it did not), the FDA has significantly delayed the timeline (and eliminated crucial dates) for finalizing heavy metal action levels. The FDA no longer plans on an April 2024 deadline for finalized lead levels, has removed its previous commitments of a timeframe to issue draft

guidance for arsenic and cadmium and now projects a deadline sometime in 2024 for only the interagency review process, and has never even adopted a timeline for finalized cadmium levels. These recent FDA developments (as outlined below) render prospective guidance from the FDA uncertain and distinguish the circumstances at bar from those in the two cases on which the district court heavily relied, *Gerber* and *Sprout Foods*, where those courts labored under the assumption that the FDA would adhere to the Closer to Zero timeline announced in 2021 in dismissing actions against other baby food sellers on primary jurisdiction grounds. But that is simply not the case.

Coupled with the fact that the FDA guidance – as foretold – consists of suggestions and recommendations to encourage manufacturers like Beech-Nut to reduce the levels of heavy metal contaminants in baby food rather than the imposition of mandatory action levels, the district court's finding that not applying the primary jurisdiction doctrine "will force the parties to litigate a case that forthcoming FDA pronouncements ***will likely render moot***" was erroneous.

In sum, the foregoing factors counsel against the application of the primary jurisdiction doctrine. Accordingly, the Court should reverse the district court's decision.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §1332(d)(2)(A) because this case is a putative class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and most Plaintiffs and most members of the Classes are citizens of a state different than Beech-Nut, which is a Delaware corporation with its primary place of business in Amsterdam, New York. A-30-72, ¶¶16-84, 87-88.[1]

The district court entered a Memorandum-Decision and Order ("Dismissal Order") on January 19, 2023 (SPA-1-13), which granted Beech-Nut's motion to

---

[1] "Plaintiffs" are Jeremy Cantor, Rebecca Abbott, Erin Abdoo, Christina Allgood (a/k/a Christina Holland), Xena Almquist, Elizabeth Austin, Emily Baccari, Alyssa Barb, Kelsey Blankenship, Amanda Boots, Olivia Boyer, Celia Bruno, Ana Butkus, Derrick Carr, Mayelin Carranza, Kaitlynn Carson, Samantha Clark, Melanie Cole, Adrianne Cooper, Sheila Curry, Erica Douglas, Nathan Edwards, Morgan Engebretsen, Albachiara Farci, Lisa Fisher, Natalie Francois, Jillian Geffken, Rebecca George, Charita Harrell, Jill Hayden, Sammi Hobdy, Malik Hockaday, Amanda Holmes, Heather Hyden, Shaylan Isaacs, Karleen Kozaczka, Tabitha Latteyer, Andrew Lohse, Heather Malaga, Elizabeth McDowell, Katherine McGibney, Kali McGlinch, LaToya McHenry, Christina Mitchell, Loukevia Moore, Brittney Moyer, Stephanie Norgaard, Corinthea Pangelinan, Robert Partello, Krishna Patel, Maurice Peterson, Amanda Rogers, Bridget Salopek, Haley Sams, Vito Scarola, Amanda Schram, Liza Sike, Brandi Slabinski, Kinder Smith, Tamaya Stevenson, Porsche Stokes, Dillon Townzen, Brittany Wallace, Monique Warren, Jordan White, Natalie Williams, Amber Wright, Ashley Yates, and Christen Zulli. A-30-71, Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint"), ¶¶16-84. The "Classes" are the putative nationwide class of persons in the United States who purchased Beech-Nut Baby Foods for personal, family, or household use, and not for resale, within the applicable statute of limitations, and the 51 statewide subclasses. A-114-23, ¶¶213-66.

dismiss (DCT ECF No. 189).  The district court dismissed the Complaint in its entirety without prejudice based on the primary jurisdiction doctrine and ordered the Clerk of Court "to enter judgment accordingly and close the file." SPA-12-13.  The Judgment and Amended Judgment were entered on January 20, 2023 and January 24, 2023, respectively.  SPA-14-29.  Thus, the Dismissal Order is final, giving this Court jurisdiction under 28 U.S.C. §1291.

Plaintiffs filed their Notice of Appeal on February 20, 2023 (A-297-99), which is 30 days after entry of the Judgment (computing time pursuant to FED. R. APP. P. 26(a)(1)(C)), and less than 30 days after entry of the Amended Judgment. Thus, this appeal is timely.  *See* FED. R. APP. P.  4.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

1.      Did the district court err in granting Beech-Nut's motion to dismiss based on the narrow doctrine of primary jurisdiction where neither of the two justifications for the doctrine – agency expertise or a desire for uniformity – supports deference to the FDA in a case unquestionably within the district court's jurisdiction?

## STATEMENT OF THE CASE

### A.      Procedural History

On February 5, 2021, the first in a series of putative class action cases was filed against Beech-Nut.  DCT ECF No. 1.  After these cases were consolidated

9

(DCT ECF No. 55) and interim co-lead class counsel was appointed (DCT ECF No. 167), Plaintiffs filed the Complaint on June 24, 2022.  A-25-296.  Plaintiffs bring statutory claims under the consumer protection statutes of all 50 states and the District of Columbia and common law claims under each of those state laws for breach of express and implied warranties, fraud by omission, and unjust enrichment. Plaintiffs' claims rest on allegations that Beech-Nut warranted, misrepresented, failed to disclose, and/or engaged in unfair and deceptive trade practices in connection with the sale of its Baby Foods,[2] namely, that (1) they contain or were at material risk of containing heavy metals, which indisputably are harmful to young children due to repeat exposure and bioaccumulation, including at levels well in excess of applicable and analogous reasonable limits; (2) Beech-Nut inadequately tested, or never tested, for all four heavy metals in the ingredients it uses and/or its finished products; and (3) when Beech-Nut does set internal standards, it allows for the sale of Baby Foods with heavy metals in excess of these limits.  Plaintiffs seek damages for these breaches of warranties, misrepresentations, material omissions, and unfair and deceptive business practices and appropriate injunctive, equitable, and declaratory relief.

On August 29, 2022, Beech-Nut moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 8, 9, 12(b)(1), and 12(b)(6).  DCT ECF No. 189.

---

[2]     *See* A-85-87, ¶115 for a complete listing of the products at issue.

10

On January 19, 2023, the Honorable David N. Hurd, U.S. District Judge for the Northern District of New York, dismissed the Complaint in its entirety based on the primary jurisdiction doctrine and did not consider any other basis for dismissal that Beech-Nut raised in its motion. *See In re Beech-Nut Nutrition Co. Baby Food Litig.*, No. 1:21-CV-133, --- F. Supp. 3d ---, 2023 WL 350818 (N.D.N.Y. Jan. 19, 2023); SPA-1-13.[3]

### B. Statement of Facts

#### 1. Beech-Nut Omitted Material Information Concerning the Presence of Heavy Metals in Its Baby Foods

Beech-Nut knowingly sells Baby Foods to unsuspecting consumers with deceptive labeling, packaging, and marketing that misrepresents and fails to disclose information concerning the presence (or material risk) of heavy metals such as arsenic, lead, cadmium, and mercury, all particularly neurotoxic to infants and children. A-26-28, 97-102, ¶¶4-8, 150-65. Beech-Nut does so despite promoting the trustworthiness, safety, and quality of its Baby Foods. A-109-10, 82-85, 101-03, ¶¶93, 107-13, 165-70. Beech-Nut promotes this on its packaging and labels, prominently displaying words such as "organic," "natural," "USDA-Certified Organic," "real food for babies," "nothing artificial added," and "non-GMO," represents that it is safe, suitable, and healthy for infants and toddlers at different

---

[3]        Unless otherwise noted, citations are omitted and emphasis is added.

"Stages" of development, and lists **healthy** heavy metals, such as "Iron," but not toxic heavy metals on its labels.  A-74-82, ¶¶95-105.

Plaintiffs further allege that Beech-Nut, through website representations and public campaigns, assures parents and the consuming public of its strict product testing practices, even though Beech-Nut is unaware of, or recklessly disregards, the actual levels of toxic heavy metals contained in its finished products because it fails to test them (or fails to test properly).  A-28, 82-84, 98-99, 102-03, ¶¶10, 108-13, 152, 156, 168-70.  For instance, Beech-Nut does not test **at all** for mercury.  A-97-98, ¶150.  Yet, Beech-Nut's pattern of representations consistently ensures that its products are safe for consumption by infants and toddlers through its thorough testing program.  For example, Beech-Nut's website stated that Beech-Nut has "been testing [] ingredients for heavy metals since 1985, and [Beech-Nut is] aware of no higher standards in the industry than the ones [Beech-Nut] employ[s]."  A-83-84, ¶111.  To accomplish this, Beech-Nut tests for approximately "255 pesticides and heavy metals (like lead, cadmium, arsenic and other nasty stuff) . . . Even in the case of our infant rice cereal, which is already below the proposed FDA limit for arsenic in rice cereals, we still test every, single lot to ensure it's safe to consume."  *Id*. Beech-Nut's website likewise represented the quality and safety of its products (which also included a specific claim about the rice cereal product Beech-Nut was ultimately forced to recall):

The EPA, USDA and other government bodies have high standards for limits on pesticides and organic certification. That's not good enough for us. Our pesticide standards are 10 times stricter than government requirements. Our infant rice cereal, for instance, is already below the proposed FDA limit for arsenic in rice cereals – we test every lot to ensure this. Beech-Nut highest standards: Our pesticide standards are 10x higher than government requirements. We test for 235 pesticides, heavy metals and toxins . . . Then we conduct more than 20 rigorous tests on our delicious purees to ensure that the safety, quality and flavors are just right – before they reach your baby's high chair. So you know that you are feeding your baby only the very best quality (and the tastiest!).

A-84, ¶112.

Unbeknownst to consumers and in flagrant contrast to these representations, Beech-Nut adopted lax internal testing standards and allows products to be sold in excess of even those weak standards.  A-103-05, ¶¶171-75; *see also* A-101, ¶163.

> ### 2. The Truth Is Revealed: Subcommittee Findings and the Rice Cereal Recall for Inorganic Arsenic Contamination

On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Subcommittee"), released a report titled, "Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" ("Report").  The Report revealed that Beech-Nut knowingly distributed and sold baby foods with toxic heavy metals. A-26-27, 97-98, 103-05, ¶¶4-5, 149-52, 171-75.  The Report's findings include that:

- Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic.

  Beech-Nut routinely used high-arsenic additives that tested over 300 ppb

13

arsenic to address product characteristics such as "crumb softness." Beech-Nut used at least 45 ingredients containing over 100 ppb arsenic.

- Beech-Nut used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 89 that contained over 15 ppb lead and 57 that contained over 20 ppb lead, limits which are over the FDA's newly proposed draft guidance to industry for lead action levels.

- Beech-Nut used 105 ingredients that tested over 20 ppb cadmium with some ingredients testing much higher, up to 344.55 ppb cadmium.

- Beech-Nut does not even test for mercury in baby food.

A-97-98, ¶150.[4] The Report further found that Beech-Nut's internal safety standards were uniquely permissive among baby food manufacturers, allowing for levels of toxic heavy metals that "far surpass any existing regulatory standard in existence and toxic heavy metal levels for any other [responding] baby food manufacturer."

---

[4]      *See also Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance for Industry* at 5, FDA (Jan. 2023), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/draft-guidance-industry-action-levels-lead-food-intended-babies-and-young-children (last accessed June 3, 2023) ("FDA Draft Lead in Baby Food Guidance"). The FDA Draft Lead in Baby Food Guidance was published after the district court issued its opinion. Nonetheless, the Court may take judicial notice of this document, as it is publicly available on the FDA website, *see, e.g.*, *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of new FDA Guidance), and thus, "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). *See also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (citing FED. R. EVID. 201(c)).

A-98, ¶151. And, not only are Beech-Nut's internal specifications insufficient, but Beech-Nut fails to abide by its own inadequate internal specifications. A-104, ¶174. For example, the Report found that "Beech-Nut sold eleven products that surpassed its own internal cadmium limits" and that "[b]y doing so, Beech-Nut accepted dehydrated potato containing 119.6, 143.5, and 148.4 ppb cadmium, far surpassing its own internal limit of 90 ppb for that ingredient." *Id.* Further, the Report made clear that Beech-Nut's policy of only doing ingredient testing "does not work" and "recklessly endangers babies and children and prevents the compan[y] from even knowing the full extent of the danger presented by [its] products." A-98, ¶152. As a result of never testing its finished products, Beech-Nut has no record of the level of heavy metals present in its Beech-Nut Baby Foods being sold in stores every day.

In September 2021, the Subcommittee released a supplemental report, titled, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods" ("Supplemental Report"), reporting that the State of Alaska conducted further testing of Beech-Nut Rice Cereal and found all samples contaminated with "dangerously high" levels of inorganic arsenic. A-27, 98-99, ¶¶6-7, 153-54. This led Beech-Nut to recall certain rice cereal products and exit the market segment entirely, admitting that it simply could not consistently meet the FDA level of 100 ppb for inorganic arsenic. A-27, 98-99, ¶¶6-7, 153-54, n.87. The Supplemental Report also reiterated a warning that went unheeded by Beech-Nut after the initial

Report: that Beech-Nut's failure to test final products, but only ingredients, "appears to have contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products." A-99, ¶156.

> ### 3. Since Baby Food Safety and Quality Are Material to Reasonable Consumers, Beech-Nut's Deceptive Labeling and Marketing Practices Injured Plaintiffs and the Classes

Plaintiffs allege it is widely scientifically accepted that heavy metals, which are found in Beech-Nut's Baby Foods, including in quantities well above applicable and analogous reasonable standards, are dangerous neurotoxins that bioaccumulate and can have irreversible, long-term effects on a baby's developing brain and nervous systems, even in very small quantities. A-89-97, ¶¶122-48. No consumer would knowingly purchase baby foods from a retailer that allowed its baby foods to contain (or risk containing) heavy metals, and certainly not at levels well in excess of reasonable limits and the company's own internal specifications, in particular where those products are not adequately tested for such contamination. *See, e.g.*, A-71, 106, 112, ¶¶85, 179, 203. Yet, Beech-Nut does not disclose any information on its packaging about the presence (or material risk) of toxic heavy metals despite knowing that reasonable consumers, who lack scientific knowledge, trust manufacturers to sell baby food free from such harmful contaminants. A-28, 73-82, 87-88, 105, 110, 137, 139, ¶¶9, 91-106, 118-19, 176, 196-97, 330-31, 340. Indeed, Beech-Nut's advertising strategy is focused on promoting Beech-Nut Baby Foods

as organic and free from unnatural ingredients in order to justify the placement of its products within the premium category of baby food. A-73-74, 110, ¶¶94, 197.

Beech-Nut's false, misleading, and deceptive packaging, labeling, advertising, and marketing of its Beech-Nut Baby Foods wrongfully conveys to consumers that Beech-Nut Baby Foods have certain superior qualities and characteristics that they do not actually possess. A-105, 110, ¶¶177, 194. Beech-Nut intentionally omitted material information from its labeling, marketing, and advertising in order to induce and mislead reasonable consumers into purchasing Beech-Nut Baby Foods. A-106, 111-12, ¶¶181, 201. This is true, especially considering the long-standing campaign by Beech-Nut to label, market, and advertise the Beech-Nut Baby Foods as, among other things, healthy, nutritious, organic, non-GMO, purely sourced, of the highest quality, rigorously tested, and safe for consumption by infants and children, and to induce consumers, such as Plaintiffs and the Classes, to purchase the products. A-111-12, ¶201.

As a result of Beech-Nut's false, misleading, and deceptive statements and omissions, a reasonable consumer would have no reason to suspect the presence (or risk) of heavy metals in the Beech-Nut Baby Foods without conducting his or her own tests or relying on tests conducted by a third party. A-112, ¶202. Thus, Plaintiffs and members of the Classes bought Beech-Nut Baby Foods they would not have otherwise bought and/or paid more for Beech-Nut Baby Foods than they

17

would have paid had it been fully disclosed that Beech-Nut Baby Foods contained (or had a material risk of containing) heavy metals (or its inadequate testing and safety standards).  A-29-30, 71, 106, 112, ¶¶14, 85, 179, 203.

### 4. The FDA Is Not Regulating Baby Food Labels Through the Closer to Zero Initiative

In response to the Report and the subsequent public outcry, the FDA initiated the "Closer to Zero: Action Plan for Baby Foods," a multi-year plan – to 2024 and "beyond" – identifying actions the FDA will take to reduce exposure to arsenic, lead, cadmium, and mercury from foods eaten by babies and young children to the lowest levels possible.[5]  The FDA's Closer to Zero initiative focuses on determining "action levels" for heavy metals in baby food, ***not*** labeling standards.[6]  According to the FDA, action levels are "a level of contamination at which a food may be regarded as adulterated within the meaning of section 402(a)(1) of the Federal Food, Drug,

---

[5]     DCT ECF No. 189-4 (MTD Ex. B), Press Release, FDA, FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children (Apr. 8, 2021); DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022).  Of note, the district court took judicial notice of the FDA materials that Beech-Nut submitted in support of its motion to dismiss.  SPA-4 n.2.  Plaintiffs cite herein Beech-Nut motion to dismiss exhibits A, B, E, H, and K (DCT ECF Nos. 189-3, 189-4, 189-7, 189-10, and 189-13, respectively).  This Court also can take judicial notice of these documents, which are available on the FDA website.  *See, e.g*., *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 412 (S.D.N.Y. 2011).

[6]     DCT ECF No. 189-4 (MTD Ex. B), Press Release, FDA, FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children (Apr. 8, 2021); DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022).

and Cosmetic Act [("FDCA")]" and are factors "when considering whether to [take compliance or] enforcement action in a particular case."[7]  None of the guidance documents relating to heavy metals reference labeling requirements.[8]  In fact, Beech-Nut admits that "the Action Plan does not contemplate requiring warning labels or disclosures on baby food products regarding heavy metals, and there is no basis to assume, let alone conclude, that the final policy decisions implemented by FDA will require manufacturers to change their labeling or advertising in any way."  DCT ECF

---

[7]     DCT ECF No. 189-3 (MTD Ex. A), *FDA Shares Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies and Young Children*, FDA (Apr. 8, 2021); DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022).

[8]     FDA Draft Lead in Baby Food Guidance; *Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance for Industry*, FDA (Aug. 2020), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-level-inorganic-arsenic-rice-cereals-infants (last accessed June 3, 2023) ("FDA Rice Cereal Action Level Guidance") (cited in the Complaint at A-91-93, ¶130 & n.42, ¶131 & n.46, ¶133 & n.50); *Draft Guidance for Industry, Arsenic in Apple Juice: Action Level*, FDA (July 2013), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/draft-guidance-industry-action-level-arsenic-apple-juice) (last accessed June 3, 2023) ("FDA Draft Arsenic in Apple Juice Guidance") (cited in the Complaint at A-92, ¶131 & n.43); *Action Levels for Lead in Juice: Draft Guidance for Industry*, FDA (Apr. 2022), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/draft-guidance-industry-action-levels-lead-juice) (last accessed June 3, 2023) ("FDA Draft Lead in Juice Guidance").  These documents are publicly available on the FDA website.  The FDA Rice Cereal Action Level Guidance and Draft Arsenic in Apple Juice Guidance also are cited in the Complaint.  Thus, the Court can properly consider as incorporated by reference and/or take judicial notice of these documents.  *See Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 117 n.1 (2d Cir. 2022) (on appeal from a Rule 12(b)(6) motion, this Court may consider allegations from "the [operative complaint], materials incorporated by reference into the complaint, and matters of which judicial notice may be taken[.]").

19

No. 189-1 at 5.  These action levels are also prospective and non-binding.  The FDA

guidance documents related to heavy metals state that the guidance, when finalized

(if draft guidance), represents the FDA's "current thinking" on the topic and that

FDA guidance documents "do not establish legally enforceable responsibilities" and

contain only non-binding "recommendations" for industry.[9]

In announcing the Closer to Zero initiative, the FDA informed the public that

"testing [. . .] shows that children are not at an ***immediate*** health risk from exposure

to toxic elements at the levels found in foods."[10]  "Immediate" is an important

qualifier because the FDA announcements are replete with admissions that chronic

exposure to even small quantities of heavy metals leads to adverse health effects,

that heavy metal levels in baby foods are not as low as they could be, and that

additional progress can be made in lowering infant and child exposure to heavy

metals.[11]  The FDA also recently issued a letter to baby food industry actors

---

[9]     FDA Draft Lead in Baby Food Guidance at 3-4; FDA Draft Arsenic in Apple
Juice Guidance at 3; FDA Draft Lead in Juice Guidance at 3; FDA Rice Cereal
Action Level Guidance at 3.

[10]    DCT ECF No. 189-4 (MTD Ex. B), Press Release, FDA, FDA Releases
Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies,
Young Children (Apr. 8, 2021).

[11]    *See, e.g.*, DCT ECF No. 189-13 (MTD Ex. K), *FDA Letter to Industry on
Chemical Hazards, including Toxic Elements, in Food and Update on FDA Efforts
to Increase the Safety of Foods for Babies and Young Children*, FDA (Mar. 5, 2021)
("Research has shown that reducing exposure to toxic elements is important to
minimizing any potential long-term effects on the developing brains of infants and
children."); DCT ECF No. 189-10 (MTD Ex. H), FDA, *Metals and Your Foods*

reminding "them of their existing responsibility to consider risks from chemical

hazards, including toxic elements, when conducting a hazard analysis, including for

products for babies and young children. The preventive control provisions require

industry to implement controls to significantly minimize or prevent any identified

chemical hazards requiring a control. For example, some manufacturers may

conduct verification activities like testing the final product."[12]  In short, the FDA

---

("Combining all of the foods we eat, even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern."); DCT ECF No. 189-3 (MTD Ex. A), *FDA Shares Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies and Young Children,* FDA (Apr. 8, 2021) ("Our plan describes the approach we will take to help continually reduce toxic elements to the lowest levels possible in foods eaten by babies and young children," necessarily implying that levels are not as low as they can be.); DCT ECF No. 189-4 (MTD Ex. B), Press Release, FDA, FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children (Apr. 8, 2021) ("we know that additional progress can be made" to reduce exposure to heavy metals in baby foods).

[12]  DCT ECF No. 189-13 (MTD Ex. K), *FDA Letter to Industry on Chemical Hazards, including Toxic Elements, in Food and Update on FDA Efforts to Increase the Safety of Foods for Babies and Young Children*, FDA (Mar. 5, 2021). *See also* FDA Draft Lead in Baby Food Guidance at 4 ("Studies suggest that manufacturers may be able to reduce lead levels in food by using practices such as thoroughly peeling root vegetables and thoroughly washing fruits and vegetables, particularly leafy vegetables (Refs. 3, 4, 5, 6). It is possible in some cases for manufacturers who have found elevated lead levels in sources of food intended for babies and young children to choose sources of food or food ingredients with lower lead levels or no detectable lead. Manufacturers could also consider increased testing of ingredients or finished products that are historically known to contain elevated lead levels; this is particularly important for ingredients or finished products intended for babies and young children. Additionally, manufacturers could consider examining their facilities, processes, and equipment to ensure that they are not contributing to lead in their products (Refs. 7, 8).").

believes there are steps the baby food industry can take of its own accord to minimize exposure to heavy metals in baby foods.

While the FDA initially published deadlines for completing various phases of the Closer to Zero initiative, only two years into these efforts, the FDA already has significantly revised its timeline for finalizing action levels through its Closer to Zero initiative:[13]

| Planned Action Item | Deadlines as Initially Announced | Deadlines as of 2023 |
|---|---|---|
| Propose draft action levels for lead | In Phase 1, by April 2022 | --Apr. 2022 for interagency review<br>--Jan. 2023 draft guidance issued |
| Finalize action levels for lead | In Phase 2, by April 2024 | ***No deadline provided*** |
| Propose draft action levels for arsenic | In Phase 2, by April 2024 | --2024 for interagency review<br>--***No timeline*** for draft guidance |
| Finalize action levels for arsenic | In Phase 3, April 2024-beyond | ***No deadline provided*** |
| Propose draft action levels for cadmium | In Phase 3, April 2024-beyond | --2024 for interagency review<br>--***No timeline*** for draft guidance |
| Finalize action levels for cadmium | ***No deadline provided*** | ***No deadline provided*** |

---

[13]    *Compare* DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022) at ECF Pg. 6-8 *with* FDA, "Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods" website landing page (current as of Mar. 3, 2023) (available at https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods) (last accessed June 3, 2023).  This Court can take judicial notice of this information from the FDA website.  *See, e.g.*, *Porrazzo*, 822 F. Supp. 2d at 412.

The FDA has delayed or walked back confirmation of ***every single deadline*** relating to lead, arsenic, and cadmium. The FDA no longer plans an April 2024 deadline for finalized lead levels. The FDA has removed its previous commitments of a timeframe to issue draft guidance for arsenic and cadmium, and now projects a deadline sometime in 2024 only for the interagency review process. The FDA has apparently abandoned its timeline for finalized arsenic levels and has never even adopted a timeline for finalized cadmium levels. In short, two years into the Closer to Zero initiative, the FDA has established no standards, has only issued draft guidance on one heavy metal, and has persistently missed, postponed, or abandoned the deadlines it assigned to itself.

For the reasons discussed below, any long delayed, non-binding, prospective final action levels for heavy metals that result from the FDA's Closer to Zero actions, which will not govern labeling, will not materially aid any court in determining whether, under the facts alleged, any legal standard was violated.

### C. The Decision Below

On January 19, 2023, the district court granted Beech-Nut's motion to dismiss the Complaint without prejudice in deference to the FDA's primary jurisdiction. *See generally* SPA-1-13. Despite recognizing that "the issue of whether a company misled consumers may be within the conventional experience of the Court," effectively conceding that the case is within the district court's jurisdiction to hear,

the district court found that the factors this Court discussed in *Ellis v. Trib. Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006), on balance, weighed in favor of applying the doctrine of primary jurisdiction, relying heavily on two non-precedential opinions, *Kimca v. Sprout Foods, Inc.*, No. BER-L-002538-22, 2022 WL 3586095 (N.J. Super. Ct. Law. Div. Aug. 17, 2022) and *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 1:21-cv-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022).  SPA-6-12.

## SUMMARY OF THE ARGUMENT

The district court erred in applying the primary jurisdiction doctrine in deference to the FDA to dismiss the action.  The primary jurisdiction doctrine is not intended to be invoked every time a court confronts scientific or technical issues that fall within an agency's purview.  Instead, two primary justifications exist for the application of the doctrine – the material need for agency expertise and a desire for uniformity of decisions between courts and the applicable agency.  *See Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002).  Neither justification supports deference to the FDA in this case under the *Ellis* factors.

The heart of this case is that it is material to the purchasing decisions of Plaintiffs and the Classes whether the Baby Foods contain (or risk containing) heavy metals, which are known neurotoxins.  Here, a Congressional investigation and other testing revealed that certain lots of Beech-Nut's infant rice cereal – a very common infant first food – exceeded the existing FDA action level for inorganic arsenic, and

Beech-Nut admitted that it cannot confidently source ingredients for infant rice cereal below the FDA action level, and thus, exited the market. Similarly, other ingredients in Beech-Nut's Baby Foods have been found to contain heavy metals, including at levels that are significantly higher than presently applicable and comparable reasonable limits and above even its own internal standards. Plaintiffs allege that had they known these facts, they would not have purchased or would have paid less for Beech-Nut's Baby Foods.

Beech-Nut's unfair, deceptive, and misleading practices in labeling, marketing, and selling Baby Foods containing (or that have a material risk of containing) heavy metals are within the conventional experience of the court to adjudicate. With regard to the first justification for the application of the primary jurisdiction doctrine, FDA expertise will not materially aid the Court in determining whether consumers are likely to be misled by Beech-Nut's conduct. The FDA's Closer to Zero initiative – the sole basis cited by the district court for deferring jurisdiction to the FDA – is not intended to direct consumers in making food choices and its guidance does not address labeling of baby foods. Further, any action levels for heavy metals in baby foods that the FDA may eventually set, which the district court concluded were necessary to resolve Plaintiffs' claims, are non-binding recommendations that will not establish "legally enforceable responsibilities" or "rights." In addition, the FDA's Closer to Zero initiative is prospective and will not

encompass a remedy for the past economic harm Plaintiffs and the Classes have incurred. As to the doctrine's second justification – the desire for uniformity, any decision in this case will not be inconsistent with any future FDA guidance relating to heavy metals in baby foods given the purpose of the FDA Closer to Zero initiative and that the parties have not made any application to the FDA for a determination regarding the specific issues in this case. In short, there are no countervailing advantages to abstaining from exercising jurisdiction in this case given that the justifications of agency expertise and uniformity will not be served. Thus, the Court should reverse the district court's decision.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6), accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *See Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court's standard of review for dismissal based on the primary jurisdiction doctrine is also *de novo*. *See Palmer*, 51 F.4th at 503 (citing *Nat'l Commc'ns. Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995)); *see also Ellis*, 443 F.3d at 83 n.14. On appeal from a grant of a motion to dismiss, this Court may "draw the factual narrative from the [operative complaint], materials incorporated by reference into the complaint, and matters of which judicial notice

26

may be taken[.]" *Soto*, 26 F.4th at 117 n.1; *see also Berkshire Bank v. Lloyds Banking Grp. Plc*, No. 20-1987-CV, 2022 WL 569819, at *4 n.5 (2d Cir. Feb. 25, 2022), *cert. denied*, 143 S. Ct. 286 (2022) (finding documents incorporated by reference in complaint proper to consider on appeal); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001), *as amended* (Apr. 20, 2001) (same).

## ARGUMENT

**I.**  **The District Court Erred in Invoking the Primary Jurisdiction Doctrine Because Future FDA Recommendations as to Heavy Metal Action Levels Will Not Materially Aid the Court in Determining Whether Beech-Nut Deceived Consumers and No Risk of Inconsistent Decisions Exists**

### A.  **The Primary Jurisdiction Doctrine Is Narrow in Scope**

The "primary jurisdiction" doctrine is "relatively narrow" in scope, *Goya Foods, Inc. v. Tropicana Prods., Inc*., 846 F.2d 848, 851 (2d Cir. 1988); *Ellis*, 443 F.3d at 82-83, and "the case law establishes that it should not be lightly invoked or applied, and that cases in which its application is warranted tend to be the exception, not the norm." *Global Crossing Bandwidth, Inc., v. OLS, Inc*., No. 05-cv-6423L, 2009 WL 763483, at *2 (W.D.N.Y. Mar. 19, 2009). Primary jurisdiction does not apply when claims involve matters within the "traditional realm of judicial competence." *Tassy*, 296 F.3d at 73. And, in particular, "the primary jurisdiction doctrine 'is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit.'" *In re Edgewell Pers. Care Litig*., No. 16-cv-3371, 2018 WL 7858623, *5 (E.D.N.Y. Sept. 4, 2018).

Rather, it "should generally be reserved for resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* Indeed, the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Tassy*, 296 F.3d at 73.

This Court directs district courts, in their discretion, to consider these non-exclusive factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis*, 443 F.3d at 82-83. This Court also instructs district courts to "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83. This Court, like the district court before it, must "examine the factors upon which the existence of the [primary jurisdiction] doctrine rests to determine whether deferral is appropriate." *Nat'l Commc'ns. Ass'n*, 46 F.3d at 222.

### B.   None of the *Ellis* Factors Supports Deference to the FDA

The district court erred in finding that the *Ellis* factors, on balance, weigh in favor of invoking the primary jurisdiction doctrine. SPA-9-12. The district court, as well as the two non-precedential opinions the district court primarily relied on,

*Sprout Foods* and *Gerber*, overinterpreted what the FDA plans to accomplish through Closer to Zero. Each court essentially concluded that resolving the plaintiffs' respective claims first requires a determination of whether the levels of heavy metals in each defendant's products were harmful. SPA-10, 12; *Gerber*, 2022 WL 10197651, at *13; *Sprout Foods*, 2022 WL 3586095, at *3.

This conclusion that FDA expertise is required to determine these labeling claims is wrong, as was recognized by the court in *In re Plum Baby Food Litig.*, No. 4:21-CV-00913, 2023 WL 3493319 (N.D. Cal. May 3, 2023). The *Plum* court considered the same facts Plaintiffs rely on here, explaining:

> On January 23, 2023, the FDA issued draft guidance for proposed action levels for lead in baby foods. These guidelines will create "action levels" for the presence of certain heavy metals and contaminants in products including baby food. Action levels are intended to assist the industry in lowering the level of these substances in baby food. They are not binding and "are not intended to set the lowest levels for industry to achieve." ***The guidance does not address labeling of baby food products.***

*Id.*, at *1. The *Plum* court refused to reconsider its prior decision that "it 'need not rely on the FDA's expertise or its potential guidance on action levels to determine whether Plum's alleged omissions are actionable given the allegations of the operative complaint'" and that "uncertainty over how and when the FDA will act counsels against an indefinite stay" pursuant to the primary jurisdiction doctrine for three reasons:

29

First, Closer to Zero does not address labeling of baby food products or the potential duty of producers to advise parents of the potential presence of heavy metals in baby food. Second, aside from their request for injunctive relief, plaintiffs' claims concern defendant's past conduct, not future conduct. Third, as the proposed guidelines would not address the key issues in this case, and would set suggested rather than mandatory action levels, Closer to Zero will at most provide the sort of expert advice that the Ninth Circuit has found is not an adequate basis for staying an action under the primary jurisdiction doctrine.

*Id.*, at \*1-2.[14] As discussed below, the *Plum* court's rationale is in accord with the weight of authority in this Circuit, and indeed, is aligned with the doctrinal framework this Court set forth in *Palmer* that agency expertise need only be sought where it "would materially assist the court in resolving difficult factual questions to determine whether specified legal standards have been violated." *Palmer*, 51 F.4th at 508-09 (concluding that OHSA's healthcare-focused actions during the COVID-19 pandemic "do not necessarily suggest that OSHA's expertise would materially aid the court in resolving the issues relating to [an Amazon facility]").[15]

---

[14] Although the *Plum* court distinguished the instant case (and the district court's opinion) as "directly challenge the safety of the product," *id.*, at \*3, Plaintiffs see little difference between the cases, both of which allege that the defendant should have disclosed on labeling the presence of heavy metals because the contaminants are neurotoxic. *Compare* Amended Complaint, *Plum*, No. 4:21-cv-00913 (Sept. 3, 2021), at ¶¶8-12, 20-24, 79-85, ECF No. 98 *with* A-28-29, 109-113, ¶¶9, 13, 193-204.

[15] The *Gerber* court seemingly attempted to distinguish the *Plum* court's original decision, contrasting the Ninth Circuit legal standard for determining the application of the primary jurisdiction doctrine with the Third and Fourth Circuit legal standards (which are the same as the standard in the Second Circuit). *See Gerber*, 2022 WL 10197651, at \*11. The distinction the *Gerber* court draws, however, is unpersuasive

30

The Court is not being asked to decide the lower bounds of acceptable heavy metals in baby foods but to evaluate Plaintiffs' allegations that Beech-Nut breached its warranties and deceived its customers through misleading statements and omissions suggesting its Baby Foods were healthy and safe for consumption by infants and young children while knowing they contained (or risked containing) toxic heavy metals, including by easily exceeding applicable and analogous reasonable levels and its own internal standards. Based on the facts alleged, neither of the two justifications for the doctrine – agency expertise or a desire for uniformity – supports the district court's decision to decline to hear a case unquestionably within its jurisdiction.

> 1. **Whether the Baby Foods Are Deceptively Labeled and Marketed and Falsely Warranted Is Within the Conventional Experience of this Court**

Plaintiffs allege Beech-Nut's non-disclosures and misrepresentations were materially misleading to reasonable consumers who, relying on Beech Nut's labels and packaging, purchased the Baby Foods believing them to be safe, healthy,

---

because the essence of the Ninth Circuit standard focuses on whether an issue "requires expertise or uniformity in administration," *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015), which are the twin goals of the doctrine in this Circuit as well. *See Tassy*, 296 F.3d at 68 ("the reasons for [the primary jurisdiction doctrine's] existence and the purposes it serves are twofold: the desire for uniformity and the reliance on administrative expertise. Thus, in determining whether to apply the primary jurisdiction doctrine, we must examine whether doing so would serve either of these purposes.").

suitable for consumption by infants and toddlers, and adequately tested, when they were not. Plaintiffs' claims turn on whether Beech-Nut – in labeling and packaging its baby food products – wrongfully "fail[ed] to disclose the presence of toxic heavy metals or that [its] Baby Foods may contain toxic heavy metals" (A-82, ¶106); falsely claimed that its testing of baby foods for heavy metals went "above and beyond" standard testing practices in the industry (A-82-84, ¶¶108-11); and misrepresented the quality and safety of its Baby Foods, claiming, *e.g.*, that government standards were "not good enough" for Beech-Nut but nevertheless "fail[ed] to abide by its own inadequate internal specifications" (A-84-87, 102, 104, ¶¶112-17, 166-67, 174). The Subcommittee found that Beech-Nut's internal standards for heavy metal levels were "uniquely permissive among baby food manufacturers," and allowed for levels of toxic heavy metals that "far surpass any existing regulatory standards . . . and toxic heavy metal levels for any other [responding] baby food manufacturer'" and yet often sold foods that exceeded its own internal standards. A-98, 104, ¶¶151, 174.

Thus, Beech-Nut's liability and damages depend on questions squarely within the "conventional experience of judges" and courts, including: (i) whether Beech-Nut's omission of information from the Baby Foods' packaging was misleading to a reasonable consumer or in breach of any warranties; (ii) whether the omitted information was material to a consumer's purchasing decision; and (iii) whether

consumers paid a price premium for the Baby Foods, based on qualities that they were misled into believing the Baby Foods had.

Contrary to the district court's findings (SPA-10, 12), the Court need not rely on the FDA's expertise or its potential guidance on action levels for heavy metals in baby food to determine whether Beech-Nut's alleged omissions are actionable given the allegations of the Complaint. The FDA's Closer to Zero initiative focuses on determining "action levels" for heavy metals in baby food, ***not*** labeling standards and warranties.[16] *Plum*, 2023 WL 3493319, at *2. Beech-Nut even admits this, arguing below that "the Action Plan does not contemplate requiring warning labels or disclosures on baby food products regarding heavy metals, and there is no basis to assume, let alone conclude, that the final policy decisions implemented by FDA will require manufacturers to change their labeling or advertising in any way." DCT ECF No. 189-1 at 5. Therefore, the action levels the FDA issues, if finalized, would not offer the guidance necessary or useful to resolve this case.

Most recently, when the FDA recently issued its delayed draft guidance relating to action levels for lead in baby foods, the FDA expressly stated: "The action levels in today's draft guidance are not intended to direct consumers in

---

[16]     DCT ECF No. 189-4 (MTD Ex. B), Press Release, FDA, FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children (Apr. 8, 2021); DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022).

making food choices."[17] The district court's decision was issued before the FDA announced the draft guidance for lead in baby foods.[18] Thus, the district court did not have the opportunity to consider that the FDA expressly disclaimed any interest or intention to affect product labeling requirements to inform parents' food choices. Moreover, the fact that the FDA made this statement also distinguishes *Gerber* and *Sprout Foods* on which the district court heavily relied.[19] "Common sense tells us that even when agency expertise would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation." *Astiana*, 783 F.3d at 761. Since it has become clear that the FDA's activity in progress does not specifically relate to baby food labeling, there is no basis to invoke primary jurisdiction for purposes of deciding Plaintiffs'

---

[17] Press Release, FDA, FDA Announces Action Levels for Lead in Categories of Processed Baby Foods (Jan. 24, 2023), https://www.fda.gov/news-events/press-announcements/fda-announces-action-levels-lead-categories-processed-baby-foods (last accessed June 3, 2023). *See, e.g*., *Porrazzo*, 822 F. Supp. 2d at 412 (taking judicial notice of documents publicly available on the FDA website).

[18] *Compare* SPA-13 (dated Jan. 19, 2023) *with* Press Release, FDA, FDA Announces Action Levels for Lead in Categories of Processed Baby Foods (Jan. 24, 2023), https://www.fda.gov/news-events/press-announcements/fda-announces-action-levels-lead-categories-processed-baby-foods (last accessed June 3, 2023). *See, e.g*., *Porrazzo*, 822 F. Supp. 2d at 412 (taking judicial notice of documents publicly available on the FDA website).

[19] *See Gerber*, 2022 WL 10197651; *Sprout Foods*, 2022 WL 3586095. *Gerber* and *Sprout Foods* also are distinguishable because neither court properly balanced the significant delays from the FDA's prospective (and perhaps indefinite) timeline. More importantly, the FDA previously established an action level for inorganic arsenic in rice cereal that Beech-Nut violated, forcing the recall and market exit, placing this case in a unique posture.

deceptive labeling and breach of warranty state law claims. *Plum*, 2023 WL 3493319, at *2.

The district court found that Plaintiffs' "claims cannot be resolved unless and until the FDA determines action levels for heavy metals in baby food," explaining:

> [Plaintiffs'] claims repeatedly assert that Beech-Nut's products are "unsafe" to consume and that it is the products' underlying toxicity, not the label statements themselves, that cause any alleged injuries. While the issue of whether a company misled consumers may be within the conventional experience of the Court, resolving plaintiffs' claims first requires a determination on whether the levels of heavy metals in Beech-Nut's products is harmful, which is within the FDA's field of expertise.

SPA-10. The district court, however, misunderstands Plaintiffs' allegations, focusing on the wrong details.

First, the district court failed to consider that, with respect to Beech-Nut's Rice Cereal, an applicable action level of 100 ppb for inorganic arsenic already exists. A-91-92, 101, 103, ¶¶131 & n.46, 163, 170.[20] Beech-Nut violated that action level and recalled certain rice cereal products, A-27, 98-99, 103, ¶¶7, 153-56, 170, and further admitted that it cannot reliably source non-contaminated rice ingredients so the inorganic arsenic levels in Beech-Nut's Rice Cereal consistently are below the FDA action level, and thus, existed the rice cereal market. A-77-78, 99, ¶¶99,

---

[20]     *See also* FDA Rice Cereal Action Level Guidance at 6.

154.  No FDA expertise is required to adjudicate Plaintiffs' and the Classes' claims relating to Beech-Nut's Rice Cereal.[21]

Furthermore, Plaintiffs' allegations are consistent with the FDA's stated position regarding inorganic arsenic, generally.  The FDA admits that "infants and children may be particularly susceptible to adverse neurodevelopmental effects of exposure to inorganic arsenic" but states that it is possible to reduce dietary exposure to inorganic arsenic "through industry's use of current good manufacturing practices, in particular selection of sources of rice or rice-derived ingredients with lower inorganic arsenic levels and testing these incoming rice and rice-derived ingredients."[22]

Plaintiffs' allegations are entirely consistent with the FDA's position that chronic exposure to arsenic – which the FDA admits exists in baby foods at levels that can and should be lower – is particularly harmful to infants and toddlers.  A-91-92, 108-09, ¶¶128-31, 133, 188-92.  Several Beech-Nut ingredients, however, *far* exceed 100 ppb arsenic, which is the reasonably analogous action level for inorganic arsenic in infant rice cereal.  Plaintiffs plead that Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic; routinely used high-arsenic additives that

_____

[21]     Most Plaintiffs allege they purchased Beech-Nut Rice Cereal.  A-31-71, ¶¶18, 20, 24-26, 34-36, 38, 42, 45-46, 49, 53, 56, 58, 60-61, 64, 66-68, 70-71, 74, 76, 79, 83.

[22]     FDA Rice Cereal Action Level Guidance at 5; *accord* FDA Draft Arsenic in Apple Juice Guidance at 3, 5.

tested over 300 ppb arsenic to address product characteristics such as "crumb softness;" and used at least 45 ingredients containing over 100 ppb arsenic. A-97, ¶150. The Report also found that Beech-Nut "set an internal specification limit . . . of 3,000 ppb inorganic arsenic for certain ingredients, including vitamin mix" and that as a result, Beech-Nut used ingredients in its baby foods containing 710.9, 465.2, and 401.4 ppb arsenic. A-104, ¶172.

Similarly, the FDA repeatedly has expressed its thinking as to lead levels in foods generally and in baby foods specifically, and again, Plaintiffs' allegations are entirely consistent with the FDA's stated positions. Foremost, the FDA states that "[l]ead, if present in food, is a contaminant,"[23] and that "[n]o safe level of lead exposure has been identified for [protecting] children's health."[24] In the FDA Draft Lead in Juice Guidance, issued April 29, 2022, the FDA speaks generally to the deleterious impact of lead on infants and young children due to chronic exposure, which also is at the heart of Plaintiffs' case:

> Lead is especially harmful to vulnerable populations, including infants,
> young children, pregnant women and their fetuses, and others with

---

[23]    FDA, Lead in Food, Foodwares, and Dietary Supplements (under heading "FDA Regulations, Guidance, and Other Standards for Industry") (available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-foodwares-and-dietary-supplements) (last accessed June 3, 2023) (cited in the Complaint at A-93-94, ¶137 n.57). This document is cited in the Complaint and is publicly available on the FDA website. Thus, the Court can properly consider and take judicial notice of this document. *See Soto*, 26 F.4th at 117 n.1.

[24]    FDA Draft Lead in Juice Guidance at 4; FDA Draft Lead in Baby Food Guidance at 5.

chronic health conditions. Even low lead exposure can harm children's health and development, specifically the brain and nervous system. Neurological effects of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Lead exposures also may be associated with immunological, cardiovascular, renal, and reproductive and/or developmental effects (Ref. 3). Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time (Ref. 4). FDA has taken actions to address lead in juice, a food commonly consumed by young children.[25]

The FDA repeats this position regarding the harmful nature of lead verbatim in the FDA Draft Lead in Baby Food Guidance, issued January 24, 2023.[26] Furthermore, the FDA has maintained an ever-decreasing action level for lead in juice since 1993 and most recently lowered the proposed action level to between 10 ppb and 20 ppb.[27] Unsurprisingly, the FDA draft guidance for lead in baby foods is in this same range: 10 ppb for fruits, vegetables (excluding single-ingredient root vegetables), mixtures (including grain and meat-based mixtures), yogurts, custards/puddings, and single-ingredient meats; 20 ppb for root vegetables (single ingredient); and 20 ppb for dry infant cereals.[28]

Again, Plaintiffs' allegations are entirely consistent with the FDA's position that no level of lead in food is safe due to bioaccumulation from even low-level chronic exposure, justifying the progressive lowering of the upper-limit levels for

---

[25] FDA Draft Lead in Juice Guidance at 3-4.
[26] FDA Draft Lead in Baby Food Guidance at 4.
[27] FDA Draft Lead in Juice Guidance at 4-5.
[28] FDA Draft Lead in Baby Food Guidance at 8.

lead in foods and juices. A-93-94, 109, ¶¶134-37, 191. Several Beech-Nut ingredients, however, *far* exceed these target limits above. Plaintiffs plead that Beech-Nut has used 89 ingredients that contain over 15 ppb lead and 57 ingredients that contain over 20 ppb lead, with some ingredients containing as much as 886.9 ppb lead. A-97-98, ¶150; *see also* A-101, ¶163. In fact, information Beech-Nut provided to the Subcommittee shows that it set internal specifications for lead in key raw ingredients at 100 ppb and as high as 5,000 ppb for certain ingredients. A-103-04, ¶¶171, 173. Similar to arsenic and lead, Beech-Nut used 105 ingredients that tested over 20 ppb cadmium, with some testing much higher, up to 344.55 ppb cadmium, and Beech-Nut does not even test for mercury in baby food. A-97-98, ¶150.

Yet, Beech-Nut does not disclose these heavy metals or the risk of heavy metal contamination on its labels, despite disclosing other heavy metals such as iron (A-76-78, ¶¶98-99), and that the manufacturing process "starts with high-quality fruits and vegetables that meet [Beech-Nut's] own standards, which in some cases are 10 times stricter than those of the U.S. government. For example, we test for 255 common contaminants, *such as lead*, other heavy metals and pesticides, to confirm that all the ingredients delivered to us and used in our products comply with our standards. If they don't, we send them back.'" A-102, ¶166 (emphasis added).

Here, liability turns on whether reasonable consumers were misled based on information omitted from Beech-Nut's packaging and whether Beech-Nut made and breached any warranties. This case is not about complex heavy metal issues that require the specialized knowledge of the FDA. It solely concerns warranties and whether they were breached and deceptive packaging and whether reasonable consumers were misled by Beech-Nut's concealment of material facts under state law. In short, when "assessing whether a label is misleading, the court need not apply the primary jurisdiction doctrine, even where the label pertains to a scientific or technical term or claim[.]" *Edgewell*, 2018 WL 7858623, at *6 (collecting cases); *see also Elkind v. Revlon Consumer Prods. Corp.*, No. 14-cv-2484, 2015 WL 2344134, at *10 (E.D.N.Y. May 14, 2015) (collecting cases and finding that determination of whether the phrase "DNA advantage" as applied to cosmetics was misleading was a question of "consumer confusion rather than anything of the technical or scientific nature better suited to the FDA"); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *8 (E.D.N.Y. Aug. 29, 2013) (finding that case involving the labeling of food products containing bioengineered products as "all-natural" was "far less about science than . . . about whether a label is misleading," and that "the reasonable-consumer inquiry upon which some of the claims in this case depends is one to which courts are eminently well suited, even well versed" (quotation omitted)).

This case falls squarely within a line of opinions from district courts in the Second Circuit in product labeling cases where dismissal on primary jurisdiction grounds was held to be inappropriate. For example, in *Clinger v. Edgewell Pers. Care Brands, LLC*, No. 3:21-CV-1040, 2023 WL 2477499, at *14 (D. Conn. Mar. 13, 2023), the plaintiffs alleged the defendants improperly labeled sunscreen with an SPF 50 rating. Like Beech-Nut, the defendants argued that the FDA was in the process of applying its expertise to the issue of benzene contamination in sunscreen since the FDA had announced a plan to respond to the Citizen's Petition "by formulating a new OTC monograph for sunscreen." *Id*. The court rejected the defendant's argument that any court ruling would potentially conflict with the updated regulations, explaining:

> [T]he plaintiffs primarily seek economic damages for past labeling practices. That the FDA is currently formulating its future response to benzene contamination need not conflict with whether the plaintiffs are entitled to retrospective relief. Neither does the FDA have any special expertise in assessing whether the absence of a benzene warning would prove deceptive to a reasonable consumer, which requires the application of bread-and-butter tort principles best suited for a judge and jury. Nor does the FDA have authority to award monetary damages to deceived purchasers. Accordingly, none of the factors weigh in favor of deferring to the FDA on the plaintiffs' remaining claims for relief.

*Id*. The same rationale applies here. *See also Plum*, 2023 WL 3493319, at *2 ("Closer to Zero does not address labeling of baby food products or the potential duty of producers to advise parents of the potential presence of heavy metals in baby food"); *Silva v. Hornell Brewing Co., Inc*., No. 20-CV-756, 2020 WL 4586394, at

*2 (E.D.N.Y. Aug. 10, 2020) ("while defining the term 'all natural' does involve technical and policy considerations, this case does not require a technical definition of 'all natural.' Instead, this case requires a determination of whether labeling the Product as "all natural" is misleading to a reasonable consumer. That type of legal question is within the conventional experience of the court and does not require FDA guidance."); *Gavilanes v. Gerber Prods. Co.*, No. 1:20-cv-05558, 2021 WL 5052896, at *3 (E.D.N.Y Nov. 1, 2021) (case involving misleading promotion of infant formula: "Courts have routinely held that cases involving the mislabeling of food products are 'far less about science than [they are] about whether a label is misleading, and the reasonable consumer inquiry upon which some of the claims in [these] case[s] depend is one which the courts are eminently well-suited, even well versed' to handle"); *McNulty v. Polar Corp*., No. 19 CIV. 8903 (LGS), 2020 WL 5658667, at *6-7 (S.D.N.Y. Sept. 23, 2020) ("The relevant inquiry is not whether a certain ingredient is artificial, but whether a reasonable consumer would be misled into thinking that the Products do not contain any non-bio-based carbon. This question is within the realm of the conventional experience of judges and juries"); *Edgewell*, 2018 WL 7858623, at *9 ("[n]othing in the FDA Statement or the Guidance for Industry indicates that the FDA will, or is even contemplating, issuing a ruling on the issue at hand in this action – namely, whether defendants improperly labeled the Products with an SPF 50 rating"); *Petrosino v. Stearn's Prods., Inc*., No.

42

16-CV-7735, 2018 WL 1614349, at *10 (S.D.N.Y. Mar. 30, 2018) ("Determining whether a reasonable consumer acting reasonably would find the term 'natural' deceptive when a product contains both natural and synthetic ingredients is a question this Court and Jury are well suited to entertain"); *Hasemann v. Gerber Prods. Co*., No. 15-CV-2995, 2016 WL 5477595, at *6 (E.D.N.Y. Sept. 28, 2016) ("a determination of whether a reasonable consumer would be deceived by the Infant Formula, an issue that is within the conventional experience of judges").  Thus, the first *Ellis* factor weighs against invoking the primary jurisdiction doctrine.

### 2.  The Specific Factual Questions at Issue Are Not Particularly within the FDA's Discretion

While "Congress gave the FDA authority over food labeling, 21 U.S.C. § 341, . . . this is only one factor, and it is not decisive." *Silva*, 2020 WL 4586394, at *2. Specifically, "in the primary jurisdiction context, whether an agency is statutorily authorized to resolve a particular issue is not itself determinative of whether to apply the doctrine." *Palmer*, 51 F.4th at 508.  The pivotal question is whether the FDA's "expertise would ***materially*** assist the court in resolving difficult factual questions to determine whether specified legal standards have been violated." *Id.* (emphasis added).  As discussed above, there are no factual disputes as to which the FDA's expertise would materially aid the Court, in particular, where Plaintiffs' allegations are consistent with current FDA positions relating to heavy metals in baby food. *See Gavilanes*, 2021 WL 5052896, at *3 (holding that where FDA had promulgated

43

labeling requirements for "infant formula" but not "transition formula" the existence of those similar regulations weighed against invoking primary jurisdiction).

The district court erroneously concluded this factor weighs in favor of FDA primary jurisdiction because "by April 2024, the FDA plans to finalize action levels for lead and propose action levels for arsenic, with cadmium and mercury consideration and decisions to follow." SPA-10-11. Action levels cannot materially aid the district court though. Even assuming *arguendo* that final action levels are eventually finalized, FDA's guidance documents setting action levels are merely "[n]onbinding [r]ecommendations" and "***do not establish legally enforceable responsibilities***."[29] (Emphasis added). The action levels would be prospective, not retroactive, and as discussed above, would not address labeling requirements.[30] As previously discussed, the central dispute is whether reasonable consumers were misled based on information omitted from Beech-Nut's packaging and whether Beech-Nut made and breached any warranties, and so the FDA's input is "not required to resolve the pertinent factual issue before the Court[.]" *Palmer*, 51 F.4th at 508; *see also Plum*, 2023 WL 3493319, at *2. Thus, the second *Ellis* factor weighs against invoking the primary jurisdiction doctrine.

---

[29] FDA Draft Lead in Baby Foods Guidance at 4; FDA Draft Arsenic in Apple Juice Guidance at 3; FDA Rice Cereal Action Level Guidance at 3; *see also* FDA Draft Lead in Juice Guidance ("do not have the force and effect of law").

[30] *See generally id.*

### 3.     No Substantial Danger of Inconsistent Rulings Exists

The district court found that "a substantial danger of inconsistent rulings" exists as evidenced by the fact that "sister courts have already considered nearly identical issues and reached differing conclusions."  SPA-11.  But this is not the correct inquiry.  "'[T]he danger of inconsistency on which the Court focuses is the danger that the FDA may issue guidance that conflicts' with the Court's ruling" in the same matter.  *de Lacour v. Colgate-Palmolive Co*., No. 16-CV-8364, 2017 WL 6550690, at *3 (S.D.N.Y. Dec. 22, 2017); *Elkind*, 2015 WL 2344134, at *10 (stating that the third factor did not concern inconsistencies between courts, but "[i]nstead, the danger of inconsistency on which the [c]ourt focuses" is whether the court's opinion will conflict with the agency's decision); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc*., 8 F. Supp. 3d 467, 477 (S.D.N.Y. 2014) ("[A]s the [FDA] is not simultaneously contemplating the same issue . . . this factor weighs against applying the primary jurisdiction doctrine, especially considering that decisions from various district and appellate courts regularly conflict.").  There is no substantial danger of inconsistent rulings between any decision by a court in this case and any prospective, potential FDA standards.  First, this matter, as explained below, is not before the FDA.  Second, the FDA's Closer to Zero initiative involves reducing infant and childhood exposure by setting prospective, non-mandatory action levels in successive stages, starting with lead only, which the FDA states will

45

continue through April 2024 and "beyond."[31]  *Plum*, 2023 WL 3493319, at *1.  The

FDA has no timeline for agency action for arsenic, mercury, and cadmium.[32]  The

FDA also does not intend to regulate baby food **labeling**.  *Id.*, at *1-2.  Further,

Plaintiffs' claims are primarily for past damages; thus, what the FDA does in the

future is irrelevant to the damages already incurred.  Given this, any decision in this

case would not be "inconsistent" with any future FDA action.  *See, e.g.*, *id.*, at *1;

*Gavilanes*, 2021 WL 5052896, at *4 (factor weighs against invoking doctrine where

FDA action to enforce certain regulations and amend another regulation regarding

infant formula labeling would result in "a generally applicable rule rather than

adjudicate a specific issue between the parties"); *Silva*, 2020 WL 4586394, at *2

("Any guidance the FDA ultimately issues about the term 'natural' will not be

inconsistent with the outcome the court reaches in this case because the FDA is not

tasked with applying a reasonable consumer standard.").  Thus, the third *Ellis* factor

weighs against invoking the doctrine.

---

[31]     DCT ECF No. 189-7 (MTD Ex. E), *Closer to Zero: Action Plan for Baby Foods*, FDA (then-current as of June 29, 2022) at ECF Pg. 6-8.

[32]     FDA, "Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods" website landing page (current as of Mar. 3, 2023) (available at https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods) (last accessed June 3, 2023).

### 4. There Is No Prior Application to the FDA

It is undisputed that neither party has made any "prior application" to the FDA to resolve the legal claims at issue. *Ellis*, 443 F.3d at 89; *see also* SPA-11-12 (finding "defendant appears to concede that the parties have not made any previous application to the FDA on the issues before this Court, and the Court is not aware of any such applications"). Thus, as the district court correctly found, "this factor weighs against finding that the FDA has primary jurisdiction." SPA-12; *see also Edgewell*, 2018 WL 7858623, at *10. Even where there has been prior application to the FDA and the FDA had opened a docket, received public comment, and affirmatively stated that it is "working diligently" on an issue, courts have found that routine and repeated delay in action by the FDA weighed against invoking the primary jurisdiction doctrine. *Silva*, 2020 WL 4586394, at *3. *See also Gavilanes*, 2021 WL 5052896, at *4 (even "if the FDA were to adopt petitioner's suggestions, it would . . . promulgate a generally applicable rule and not adjudicate a specific issue between the parties.").

### 5. Applying the Primary Jurisdiction Doctrine Would Indefinitely Delay the Resolution of this Case, Prejudicing Plaintiffs

In addition to evaluating the *Ellis* factors, this Court instructs courts to "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Nat'l Commc'ns*

*Ass'n*, 46 F.3d at 223.   In conducting this balancing analysis, the district court acknowledged "that applying the primary jurisdiction doctrine would necessarily delay [P]laintiffs' case," but then impermissibly interjected its personal view on the merits of the case, stating (as a counterpoint to the admitted prejudice Plaintiffs will suffer) that not applying the doctrine "will result in increased costs and complications because it will force the parties to litigate a case that forthcoming FDA pronouncements ***will likely render moot***."   SPA-12.   The district court thus concluded this balancing test did not decisively favor either party.   *Id*.   The district court erred, however, in balancing the advantages and disadvantages by considering the merits of Plaintiffs' allegations, which must be taken as true with all inferences drawn in Plaintiffs' favor at the motion to dismiss stage.   *Ashcroft*, 556 U.S. at 678.   Given that it will take until 2024 and beyond for the FDA to set prospective, non-mandatory action levels (which do not regulate labeling) for just one of the four toxic heavy metals, after which the process may begin for other heavy metals, the balance tips against applying the doctrine due to the costs and complications from the indefinite delay resulting from this protracted regulatory process.   *See Silva*, 2020 WL 4586394, at *3.   In reality, there are no countervailing advantages to the district court abstaining from exercising its jurisdiction because the FDA is not promulgating standards that will aid the district court in determining Plaintiffs' claims for predominantly past harms.   In short, application of the "primary

48

jurisdiction is not required when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make." *Clinger*, 2023 WL 2477499, at *13.

In conclusion, the overwhelming weight of decisions in this Circuit counsels against a broad use of the primary jurisdiction doctrine. Were the court to stay private actions indefinitely simply because the FDA (or some other federal or state agency) may in the future weigh in with a regulatory recommendation even tangentially related to some aspect of the case, it would mean that the bulk of consumer, environmental, health, and safety actions could not proceed. Courts would, in practice, be handing over to regulatory agencies the decision about what actions in private tort would be permitted to move forward. And perversely, the more significant cases – with more widespread impact on public health and safety and more egregious defendant misbehavior – would be those most likely to be halted because an agency was compelled by that very behavior to show a potential interest in future involvement in that arena. This, clearly, is not how this narrow doctrine is supposed to operate, and it is why courts have viewed invoking primary jurisdiction as the "exception, not the norm." *Global Crossing Bandwidth*, 2009 WL 763483, at *2.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court reverse the district court's Dismissal Order granting Beech-Nut's motion to dismiss on primary jurisdiction grounds and remand the case to the district court for further proceedings.

Dated:    June 6, 2023    Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

By:   */s/ Erin Green Comite*
Erin Green Comite
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
ecomite@scott-scott.com

Steven L. Bloch
SILVER GOLUB & TEITELL LLP
One Landmark Square
15th Floor
Stamford, CT 06901
Tel.: (203) 325-4491
Fax: (203) 325-3769
sbloch@sgtlaw.com

***Counsel for Plaintiffs-Appellants and
Consolidated Plaintiffs-Appellants***

50

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,539 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: Colchester, Connecticut
    June 6, 2023