# No. 23-220

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JORDAN WHITE, ROBERT PARTELLO, ERIN ABDOO, BRIDGET SALOPEK,
OLIVIA BOYER, REBECCA GEORGE, CORINTHEA PANGELINAN, ELIZABETH
AUSTIN, STEPHANIE NORGAARD, AMANDA SCHRAM, LATOYA MCHENRY,
ERICA DOUGLAS, TABITHA LATTEYER, MORGAN ENGEBRETSEN,
MCGLINCHKALI, AMANDA ROGERS, MAURICE PETERSON,
SHEILA CURRY, KATHERINE MCGIBNEY, NATALIE FRANCOIS,
HEATHER MALAGA, TAMAYA STEVENSON,

*(Caption continued on inside cover and inside pages)*

On Appeal from the United States District Court
for the Northern District of New York, No. 21-cv-133

## DEFENDANT-APPELLEE'S RESPONSE BRIEF

Keri E. Borders
Rebecca B. Johns
KING & SPALDING LLP
633 West Fifth Street
Ste. 1600
Los Angeles, CA 90071

Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

Livia M. Kiser
KING & SPALDING LLP
110 North Wacker Drive, Ste. 3800
Chicago, IL 60606

*Counsel for Appellee Beech-Nut Nutrition Company*

September 1, 2023

LIZA SIKE, KARLEEN KOZACZKA, MAYELIN CARRANZA, ANA BUTKUS, MONIQUE WARREN, CELIA BRUNO, SAMANTHA CLARK, ELIZABETH MCDOWELL, JILL HAYDEN, BRANDI SLABINSKI, KELSEY BLANKENSHIP, SAMMI HOBDY, LISA FISHER, PORSCHE STOKES, MELANIE COLE, KINDER SMITH, LOUKEVIA MOORE, XENA ALMQUIST, NATHAN EDWARDS, SHAYLAN ISAACS, ALBACHIARA FARCI, AMBER WRIGHT, CHRISTEN ZULLI, KRISHNA PATEL, DERRICK CARR, MALIK HOCKADAY, ASHLEY YATES, CHARITA HARRELL, BRITTANY WALLACE, ANDREW LOHSE, ADRIANNE COOPER, ALYSSA MEGAN BARB, REBECCA ABBOTT, CHRISTINA MITCHELL, BRITTNEY MOYER, AMANDA HOLMES, AMANDA BOOTS, DILLON TOWNZEN, NATALIE WILLIAMS, CHRISTINA ALLGOOD, AKA CHRISTINA HOLLAND,

*Plaintiff-Appellants*,

JEREMY CANTOR, On behalf of themselves and all others similarly situated, HEATHER HYDEN, On behalf of themselves and all others similarly situated, HALEY SAMS, On behalf of themselves and all others similarly situated, VITO SCAROLA, On behalf of themselves and all others similarly situated, EMILY BACCARI, On behalf of themselves and all others similarly situated, JILLIAN GEFFKEN, On behalf of themselves and all others similarly situated, KAITLYNN CARSON, On behalf of themselves and all others similarly situated,

*Consul Plaintiff-Appellants*,

LAURIE THOMAS, Individually and on behalf of all others similarly situated, ALISON KAVULAK, Individually and on behalf of all others similarly situated, JEN MACLEOD, Individually and on behalf of all others similarly situated, MARY NARVAEZ, Individually and on behalf of all others similarly situated, ALISON FLEISSNER, Individually and on behalf of all others similarly situated, EMILY BIGAOUETTE, Individually and on behalf of all others similarly situated, LAURA EGGNATZ, Individually and on behalf of all others similarly situated, TERESA HAGMAIER, Individually and on behalf of all others similarly situated, NICOLE FALLON, Individually and on behalf of all others similarly situated,

*Plaintiffs*,

LAURA PEEK, Individually and on Behalf of All Others Similarly Situtated, ROBYN MOORE, Individually and on Behalf of All Others Similarly Situtated, GABRIELLE STUVE, Individually and on Behalf of All

Others Similarly Situated, MATTIA DOYLE, on behalf of himself and all other similarly situated, LEE BOYD, Individually and on Behalf of All Others Similarly Situtated, ASHLEY ALLEN, On behalf of themselves and all others similarly situated, DOMINICK GROSSI, On behalf of themselves and all others similarly situated, ANTHONY HARRISON, On behalf of themselves and all others similarly situated, NEISHA DANIELS, On behalf of themselves and all others similarly situated, HEATHER MCCORMICK, On behalf of themselves and all others similarly situated, HANNAH GRANDT, On behalf of themselves and all others similarly situated, AMBER CAUDILL, On behalf of themselves and all others similarly situated, MICHAEL MOTHERWAY, Individually and on behalf of all others similarly situated, KATHEY HENRY, Individually and on behalf of all others similarly situated, KELSEY GANCARZ, Individually and on behalf of all others similarly situated, ATAHSIA SMILEY, Individually and on behalf of all others similarly situated, NAJAH A. HENRY, Individually and on behalf of all others similarly situated, CHANEL J. JACKSON, Individually and on behalf of all others similarly situated, ALEXIS DIAS, Individually and on behalf of all others similarly situated, HOLLY BUFFINTON, Individually and on behalf of all others similarly situated, CONSTANCE VENABLE, Individually and on behalf of all others similarly situated, TERESA WILSON, individually, and on behalf of all others similarly situated, RYAN SANDERS, individually, and on behalf of all others similarly situated, SUSAN CANADA, individually, and on behalf of all others similarly situated, TABATHA SIDI, individually, and on behalf of all others similarly situated, TIFFANIE SKIBICKI, individually, and on behalf of all others similarly situated, HEATHER AGE, individually, and on behalf of all others similarly situated, JOLINA MANLEY, individually, and on behalf of all others similarly situated, JESSICA DAVID, individually, and on behalf of all others similarly situated, CASSANDRA MARTELL, individually, and on behalf of all others similarly situated, MIESHIA DOUGLAS, individually, and, JESSICA LOGGINS, on Behalf of Herself and All Others Similarly Situated, ANA LYNETTE GREGORY ELDRIDGE, Individually and on behalf of all others similarly situated, EMILY ORSAK, on behalf of themselves and a class of all others similarly situated, JULIE CHATAGNIER, on behalf of themselves and a class of all others similarly situated, MARIE MEZILE, individually and on behalf of all others similarly situated, ALYSSA ROSE, on behalf of themselves and all others similarly situated, MYJORIE PHILIPPE, on behalf of themselves

and all others similarly situated, MELISSA SISK, on behalf of themselves and all others similarly situated, VANESSA INOA, on behalf of themselves and all others similarly situated, ASYIA ANDREWS, individually and on behalf of all others similarly situated, STACIA CULLORS, an individual, L. C., through their guardian ad litem STACIA CULLORS, V. C., through their guardian ad litem STACIA CULLORS, ANTHONY BACANI, an individual, D. B., through their guardian ad litem ANTHONY BACANI, E. B., through their guardian ad litem ANTHONY BACANI, JENNIFER CULLORS, an individual, A. C., through their guardian ad litem JENNIFER CULLORS, J. C., through their guardian ad litem JENNIFER CULLORS, N. C., through their guardian ad litem STACIA CULLORS,

*Consul Plaintiffs*,

v.

BEECH-NUT NUTRITION COMPANY,

*Defendant-Appellee*.

iii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Beech-Nut Nutrition Company is a wholly-owned subsidiary of Hero USA, Inc., which is wholly owned by Hero Beteiligungen AG, which is a wholly-owned subsidiary of Hero AG, which is wholly owned by Schwartau International GmbH, which is wholly owned by AOH Nahrungsmittel GmbH & Co. KG, which is privately held. No publicly held corporation owns 10% or more of Beech-Nut Nutrition Company's stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................i

TABLE OF AUTHORITIES ...................................................iv

INTRODUCTION ................................................................1

STATEMENT OF THE ISSUES ...........................................5

STATEMENT OF THE CASE ...............................................6

    A.    FDA Is Responsible For Regulating The Safety Of The Food Supply ......................................................6

    B.    The Congressional Subcommittee Staff Report ..................11

    C.    FDA's Closer To Zero Action Plan .......................................13

    D.    Plaintiffs' Complaint .............................................................17

SUMMARY OF ARGUMENT ...............................................19

STANDARD OF REVIEW ....................................................21

ARGUMENT .........................................................................22

I.    The District Court Properly Applied The Primary Jurisdiction Doctrine To Dismiss the Complaint ..........................22

    A.    FDA's Work On Closer To Zero Will Directly Impact The Resolution Of Plaintiff's Claims ..................................24

    B.    Making Determinations About The Safety And Appropriate Labeling Of Baby Food Involves Technical And Policy Considerations Uniquely Within FDA's Mandate And Purview ..................................35

    C.    There Is A Substantial Danger Of Inconsistency If The District Court Makes Its Own Independent Determination Regarding Heavy Metals Separate From FDA ..............................................................................38

    D.    The Report Is An Application To FDA On This Specific Topic On Behalf Of The Public And Industry ................................................................ 41

    E.    Resolution Of Plaintiffs' Claims Will Not Be Needlessly Delayed ............................................... 43

CONCLUSION ....................................................................... 45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*All Am. Tel. Co. v. AT&T, Inc.*,
　2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010) ........................................ 23

*Astiana v. Hain Celestial Grp., Inc.*,
　783 F.3d 753 (9th Cir. 2015) ............................................................. 22

*Backus v. Gen. Mills, Inc.*,
　122 F. Supp. 3d 909 (N.D. Cal. 2015) ................................................. 36

*Backus v. Nestlé USA, Inc.*,
　167 F. Supp. 3d 1068 (N.D. Cal. 2016) ............................................... 34

*Canale v. Colgate-Palmolive Co.*,
　258 F. Supp. 3d 312 (S.D.N.Y. 2017) ................................................. 22

*Clark v. Time Warner Cable*,
　523 F.3d 1110 (9th Cir. 2008) ...................................................... 23, 38

*Cohen v. Apple Inc.*,
　46 F.4th 1012 (9th Cir. 2022) .......................................................... 34

*Coyle v. Hornell Brewing Co.*,
　2010 WL 2539386 (D.N.J. June 15, 2010) ...................................... 27, 39

*Danna v. Air France*,
　463 F.2d 407 (2d Cir. 1972) ............................................................ 39

*Doss v. Gen. Mills, Inc.*,
　2019 WL 7946028 (S.D. Fla. June 14, 2019) ...................................... 31

*Doss v. Gen. Mills, Inc.*,
　816 F. App'x 312 (11th Cir. 2020) ..................................................... 32

*Ellis v. Tribune Television Co.*,
　443 F.3d 71 (2d Cir. 2006) ........................................................ *passim*

*Farina v. Nokia Inc.*,
　625 F.3d 97 (3d Cir. 2010) .......................................................... 34, 35

iv

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) ............................................................... 34

*Gavilanes v. Gerber Prods. Co.,*
    2021 WL 5052896 (E.D.N.Y. Nov. 1, 2021) ....................... 28

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) ............................................................. 34

*Haggag v. Welch Foods, Inc.,*
    2014 WL 1246299 (C.D. Cal. Mar. 24, 2014) ..................... 41

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.,*
    2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ......... 26, 31, 39

*In re KIND LLC "Healthy & All Natural" Litig.,*
    209 F. Supp. 3d 689 (S.D.N.Y. 2016) ............................ 23, 41

*In re Plum Baby Food Litig.,*
    2023 WL 3493319 (N.D. Cal. May 3, 2023) ................. 27, 28

*In re Plum Baby Food Litig.,*
    637 F. Supp. 3d 210 (D.N.J. 2022) ...................................... 31

*In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.,*
    397 F. Supp. 3d 406 (S.D.N.Y. 2019) ................................. 32

*Kimca v. Sprout Foods, Inc.,*
    2022 WL 1213488 (D.N.J. Apr. 25, 2022) ........................... 31

*Kimca v. Sprout Foods, Inc.,*
    2022 WL 3586095 (N.J. Super. Ct. Law Div. Aug. 5, 2022) ...... *passim*

*Nat'l Commc'ns Ass'n v. AT&T Co.,*
    46 F.3d 220 (2d Cir. 1995) .................................................. 21

*Palmer v. Amazon.com, Inc.,*
    51 F.4th 491 (2d Cir. 2022) .......................................... 21, 42

*Paradowski v. Champion Petfoods USA, Inc.,*
    2023 WL 3829559 (2d Cir. June 6, 2023) ........................ 1, 24

*Pels v. Keurig Dr. Pepper, Inc.*,
    2019 WL 5813422 (N.D. Cal. Nov. 7, 2019)......................................32

*Phan v. Sargento Foods, Inc.*,
    2021 WL 2224260 (N.D. Cal. June 2, 2021) .....................................32

*Physicians Comm. for Responsible Med. v. Gen. Mills, Inc.*,
    2006 WL 3487651 (E.D. Va. Nov. 30, 2006) ...............................35, 41

*POM Wonderful LLC v. Coca Cola Co.*,
    573 U.S. 102 (2014) ................................................................................6

*Quidera v. Blackstone Labs, LLC*,
    2021 WL 4958789 (S.D. Fla. Mar. 8, 2021) .................................28, 36

*Red v. Gen. Mills, Inc.*,
    2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) .....................................34

*Samuels v. Air Transp. Loc. 504*,
    992 F.2d 12 (2d Cir. 1993) ...................................................................22

*Simon v. Smith & Nephew, Inc.*,
    990 F. Supp. 2d 395 (S.D.N.Y. 2013)..................................................22

*Tassy v. Brunswick Hosp. Ctr., Inc.*,
    296 F.3d 65 (2d Cir. 2002) ...............................................20, 24, 44, 45

*Tran v. Sioux Honey Ass'n*,
    2017 WL 5587276 (C.D. Cal. Oct. 11, 2017)......................................27

*Wallace v. ConAgra Foods, Inc.*,
    747 F.3d 1025 (8th Cir. 2014)..............................................................32

**Statutes**

21 U.S.C. § 331(a) .......................................................................................6

21 U.S.C. § 337 ...........................................................................................6

21 U.S.C. § 342 ........................................................................................6, 7

21 U.S.C. § 343 ...........................................................................................7

21 U.S.C. § 346 ........................................................................ 7

21 U.S.C. § 371 ................................................................. 6, 35

21 U.S.C. § 393(b)(2)(A) .................................................. 6, 35

**Regulations**

21 C.F.R. § 7.1 *et seq.* ...................................................... 6, 35

21 C.F.R. § 101.17 ............................................................. 7, 10

21 C.F.R. § 109.6(d) .......................................................... 7, 29

Food Labeling; Declaration of Ingredients,
    56 Fed. Reg. 28,592 (June 21, 1991) ................................... 9

**Other Authorities**

Cal. Env't Prot. Agency Off. of Env't Health Hazard
    Assessment, Acrylamide Briefing Binder:
    Background Materials for CIC Consultation on
    OEHHA Proposed Acrylamide Workplan (Oct. 17, 2003),
    https://tinyurl.com/mrykzhvn ............................................. 8

*Closer to Zero: Reducing Childhood Exposure to*
    *Contaminants from Foods*, FDA.gov (Aug. 10, 2023),
    https://tinyurl.com/22kmtmbf ................................... 3, 15, 43

FDA,
    Draft Guidance: Action Levels for Lead in Juice (Apr.
    2022), https://tinyurl.com/4hc49ste .................................. 14

FDA,
    Draft Guidance: Action Levels for Lead in
    Food Intended for Babies and Young Children (Jan. 2023),
    https://tinyurl.com/ybx68thj ........................... 7, 15, 29, 31

H. Subcomm. on Econ.
& Consumer Policy Comm. on Oversight & Reform,
Staff Report: New Disclosures Show Dangerous Levels
of Toxic Heavy Metals in Even More Baby Foods
(Sept. 29, 2021), https://tinyurl.com/2sdm47nh ................................. 31

Press Release,
FDA Announces Action Levels for Lead
in Categories of Processed Baby Foods (Jan. 24, 2023),
https://tinyurl.com/msheck2h ............................................................. 16

*What FDA Is Doing to Protect Consumers
from Toxic Metals in Foods*, FDA.gov (Apr. 20, 2018),
https://tinyurl.com/3p3psvky ................................................................. 2

## INTRODUCTION

[W]e acknowledge the importance of consumer labeling, especially as it relates to food for both humans and pets alike. However, ***it is not within the province of the courts to decide what information must be disclosed on consumer packaging. That issue should be for Congress or a federal agency such as the FDA to determine***.

*Paradowski v. Champion Petfoods USA, Inc.*, 2023 WL 3829559, at *3 (2d Cir. June 6, 2023) (emphasis added).

The district court below applied this essential principle—that the U.S. Food & Drug Administration ("FDA"), and not courts, is empowered to decide in the first instance how to regulate food labeling and food safety—in concluding that the issues raised by plaintiffs in their consolidated amended class action complaint fell within FDA's primary jurisdiction. Plaintiffs' opening brief provides no basis to depart from that well-reasoned determination.

Far from being a "garden variety" false advertising case, plaintiffs' claims require resolution of complex food safety and food labeling issues that are relevant not only to Beech-Nut Nutrition Company's baby food, but to all food, since the natural elements in question are ubiquitous in the air, water, soil, plants, and animals throughout the planet. "A reality about our food supply is that" naturally occurring "metals, such as

arsenic, lead, cadmium, mercury, and others—are present in certain foods" and they "cannot be completely avoided in the fruits, vegetables, or grains that are the basis for baby foods."[1]  Agricultural products that are part of the foundation of a healthy and nutritious diet, such as apples, sweet potatoes, carrots, and spinach, all potentially (and unavoidably) contain some trace levels of heavy metals.

Because the science of food production and food safety is complex, Congress long ago directed FDA to establish and enforce a national program of food safety regulations. Relying on the expertise of agency scientists is important because there are no easy solutions—a thoughtful, uniform, robust, scientific approach is critical. As FDA has explained, because "[r]educing levels of contaminants in foods is complicated and multifaceted," it is "crucial to ensure that measures taken to limit arsenic, lead, cadmium, and mercury in foods do not have unintended consequences—*like eliminating from the marketplace foods that have*

---

[1] *What FDA Is Doing to Protect Consumers from Toxic Metals in Foods*, FDA.gov (Apr. 20, 2018), https://tinyurl.com/3p3psvky; Dkt. 189-5 at 1.

*significant nutritional benefits or reducing the presence of one element while increasing another.*"[2]

Despite the gravity of the issues implicated by the complaint—including the health of vulnerable children, their ability to consume healthy, nutritious foods, whether Beech-Nut's products were falsely advertised as "safe" for children to eat, and whether the food should be required to bear a warning label because of the presence of heavy metals—plaintiffs assert that this case is within the "'conventional experience of judges'" and does not require "[FDA] expertise or a desire for uniformity." Opening Br. 4, 9, 28 (quoting *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006)).

But that erroneous and simplistic argument ignores the complexity of the issues on which plaintiffs have asked the court to weigh in and ignores the substantial risk of adverse consequences that could result if courts do not defer to FDA. For example, court rulings on these issues could create panic amongst consumers causing them to stop feeding important, nutritious foods to their children, or could result in the

---

[2] *Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods*, FDA.gov (Aug. 10, 2023), https://tinyurl.com/22kmtmbf (emphasis added).

imposition of standards on food companies that are impossible to meet due to the fact that the elements are naturally occurring, resulting in the elimination of healthy products from the food supply that provide children with essential nutrition.

Indeed, the very Congressional Subcommittee whose report was the impetus of this litigation did not suggest that *plaintiffs' lawyers* should file consumer class actions or imply that these complex issues should be resolved by courts in the first instance. Instead, Congress called on *FDA* to act, consistent with the agency's mission. And that is exactly what FDA is doing through the Closer to Zero action plan and the agency's on-going regulation and outreach to consumers, manufacturers, and farmers.

It is because of Closer to Zero, and FDA's primary and essential role in regulating the safety and labeling of the U.S. food supply, that the district court found that after applying the factors outlined in *Ellis*, 443 F.3d at 82-83, plaintiffs' claims fell within FDA's primary jurisdiction. Each of the *Ellis* factors weigh in favor of deferral to FDA in this case. Plaintiffs' false advertising claims are inextricably bound to their allegations that Beech-Nut's baby food is unsafe and unsuitable for

consumption, which is untrue, and which falls squarely within FDA's field of expertise and statutory mandate. Moreover, deferring to FDA in this case is essential to promoting uniformity for all baby food consumers, throughout the nation. As FDA completes its work regulating heavy metals in baby foods and finishes its Closer to Zero action plan, it is impossible for courts to determine whether Beech-Nut's baby food is "mislabeled." Absent guidance from the scientists and regulators at FDA that have been researching these issues for decades, there is a substantial danger of inconsistent rulings between the courts and FDA, and between and among individual courts.

Accordingly, the judgment of the district court granting the motion to dismiss under the doctrine of primary jurisdiction should be affirmed.

## STATEMENT OF THE ISSUES

Whether the district court properly granted Beech-Nut's motion to dismiss, in deference to FDA's primary jurisdiction, in a case implicating issues squarely within the jurisdiction of the agency's scientific expertise and that FDA is already working assiduously to address.

## STATEMENT OF THE CASE

### A.    FDA Is Responsible For Regulating The Safety Of The Food Supply.

Through the Food, Drug & Cosmetic Act ("FDCA"), Congress delegated responsibility to FDA to (i) ensure that foods are safe, wholesome, sanitary, and properly labeled, (ii) promulgate regulations implementing the FDCA's provisions, and (iii) enforce those regulations through administrative proceedings. 21 U.S.C. §§ 371, 393(b)(2)(A); 21 C.F.R. § 7.1 *et seq.* There is no private right of action to enforce FDCA regulations. *See* 21 U.S.C. § 337; *see also POM Wonderful LLC v. Coca Cola Co.*, 573 U.S. 102, 109 (2014).

***FDA action levels.*** As part of its statutory mandate, FDA prohibits the introduction into interstate commerce of any food that is *adulterated*—that is, any food that fails to meet FDA standards, including food that is harmful to human health. 21 U.S.C. § 331(a); 21 U.S.C. § 342.  But FDA does not consider a food to be adulterated when it contains a small quantity of a potentially toxic or deleterious substance, like heavy metals, that are ubiquitous in the soil, water, and air and therefore cannot be avoided, because the "quantity of such

6

substance in such food does not ordinarily render it injurious to health." 21 U.S.C. § 342(a)(1).

FDA instead sets limits, known as "action level[s]," that limit the permissible quantity of a certain substance that can be found in food. 21 U.S.C. § 346; 21 C.F.R. § 109.6(d). Only a food that exceeds proscribed action levels can be considered adulterated. 21 C.F.R. § 109.6(d); *see also* FDA, Draft Guidance: Action Levels for Lead in Food Intended for Babies and Young Children, at 4 (Jan. 2023) ("Draft Lead Guidance"), https://tinyurl.com/ybx68thj. The action levels set by FDA, including in the Draft Lead Guidance, reflect its extensively researched and expert scientific judgment as to what levels are necessary and appropriate to maintain a safe and nutritious food supply.

***FDA labeling regulations.*** When appropriate for health and safety, the agency may also promulgate food labeling, including requiring labeling that discloses the presence of substances associated with health risks, as it does with (for example) trans fats. 21 U.S.C. § 343. FDA carefully deliberates whether a warning label is appropriate based on its research and any scientific evidence demonstrating a specific, likely, and imminent harm. *See* 21 C.F.R. § 101.17; 21 U.S.C. § 343(w).

FDA has long recognized the danger in vague and broad "warning labels." Not all warnings are helpful to consumers, and such label warnings may instead have significant negative consequences. For example, in response to California's proposal that manufacturers be required to have a Proposition 65 warning label for acrylamide, FDA stated:

> FDA is concerned that premature labeling of many foods with warnings about dangerous levels of acrylamide would confuse and could potentially mislead consumers, both because the labeling would be so broad as to be meaningless and because the risk of consumption of acrylamide in food is not yet clear. Furthermore, consumers may be misled into thinking that acrylamide is only a hazard in store-bought food. . . . Consumers who avoid eating some of these foods, such as breads and cereals, may encounter greater risks because they would have less fiber and other beneficial nutrients in their diets. For these reasons, premature labeling requirements would conflict with FDA's ongoing efforts to provide consumers with effective scientifically based risk communication to prevent disease and promote health.[3]

FDA has consistently recognized the risks of "overexpos[ing] consumers to warnings," which could result in consumers "ignor[ing]" and

---

[3] Cal. Env't Prot. Agency Off. of Env't Health Hazard Assessment, Acrylamide Briefing Binder: Background Materials for CIC Consultation on OEHHA Proposed Acrylamide Workplan, at Tab 5, pdf p. 28 (Oct. 17, 2003), https://tinyurl.com/mrykzhvn.

"becom[ing] inattentive" to "all such statements." Food Labeling; Declaration of Ingredients, 56 Fed. Reg. 28,592, 28,615 (June 21, 1991).

Taking this careful approach, FDA has recognized the need to enact regulations providing for warning labels, when necessary, in only very limited circumstances. Those circumstances include: (1) self-pressurized containers ("[a]void spraying in eyes"); (2) self-pressurized containers with halocarbon or hydrocarbon propellants ("[u]se only as directed. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal"); (3) foods packaged with ozone-depleting substances; (4) food products in liquid, powdered, tablet, or capsule form that derive more than 50 percent of their total caloric value from whole proteins ("[v]ery low calorie protein diets (below 400 Calories per day) may cause serious illness or death"); (5) dietary supplements containing iron or iron salts ( "[a]ccidental overdose of iron-containing products is a leading cause of fatal poisoning in children under 6. Keep this product out of reach of children"); (6) foods containing psyllium husk (consume with water to avoid choking hazard); (7) juices that have not been processed to remove pathogens ("[t]his product has not been pasteurized and, therefore, may contain harmful bacteria that can cause

serious illness"); and (8) shell eggs (safe handling instructions to prevent illness from bacteria). 21 C.F.R. § 101.17(a)-(h).

Unlike the generalized warning requested by plaintiffs that consuming baby food (or agricultural products) is "dangerous" for non-specific reasons, each one of the warnings FDA has previously approved is tailored to a very specific and identifiable risk that could cause a direct and immediate harm to a consumer. It is therefore significant that FDA has never recommended or required a warning label for foods relating to naturally occurring metals, including baby foods. Indeed, FDA has known for decades that all food, including baby food, has the potential to contain one or more naturally occurring heavy metals, but it has never recommended or required warnings. And that is for good reason: as FDA has repeatedly stated, children are "*not at an immediate health risk* from exposure to toxic elements in foods." Dkt. 189-3 at 3. Moreover, requiring warnings whenever a food runs the risk of containing trace amounts of heavy metals would inevitably lead to warnings on nearly all food sold in grocery stores, rendering the "warnings" meaningless and ineffective.

**B.     The Congressional Subcommittee Staff Report**

Against this regulatory backdrop, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a report on February 4, 2021 (the "Report") taking issue with the presence of trace amounts of naturally occurring heavy metals in the fruits, vegetables, and grains found in baby and toddler foods. The Report did not study any potential for risk of harm to children from consuming food containing these levels of heavy metals. Nor did it cite any medical, nutritional, or scientific authority finding that baby food products (or any other food products comprised from those same ingredients) are, or could be, unsafe. It nonetheless made hyperbolic and unsupported statements that baby food products that have been consumed for decades are "unsafe" because of the presence of trace amounts of heavy metals taken up in certain ingredients during the growing process. In reaching this "conclusion," the Report relied primarily on selective and charged statements from two consumer advocacy groups. The Report called on FDA to act and to set action levels, where necessary, for heavy metals in baby food.

11

Not surprisingly, the Report garnered significant media attention. Concerned that the Report's uninformed rhetoric would panic the public and potentially lead to negative health outcomes for children if they were deprived of necessary and nutritious foods, FDA immediately issued public statements informing consumers that "testing shows that children are *not at an immediate health risk* from exposure to toxic elements in foods." Dkt. 189-3 at 3 (citation omitted). FDA reassured the public that it "routinely monitors" levels of heavy metals in food and, if it discovers levels that pose a health risk, it will remove the affected foods from the market. *Id*. at 4.

Significantly, FDA urged consumers not to discard or stop feeding packaged baby foods to children. It cautioned consumers that eliminating food groups, including fruits and vegetables, from children's diets could result in nutritional deficiencies and potential poor health outcomes. *See id*. FDA recognized that given the ubiquitous nature of heavy metals, the elimination of foods from the food supply because they may contain heavy metals "could result in significant reductions in the availability of nutritious, affordable foods that many families rely on for their children." Dkt. 189-4 at 1. Even the consumer advocacy group relied on by the

Subcommittee found "no evidence to suggest that homemade baby food has lower heavy metal levels than store-bought brands. Heavy metal levels varied widely by food type, not by who made the food." Dkt. 189-6 at 1. FDA agreed and issued a Constituent Update, which stated that heavy metals cannot be completely avoided in fruits, vegetables, and grains, and cannot be avoided by using organic farming practices. Dkt. 189-5.

### C.    FDA's Closer To Zero Action Plan

On April 8, 2021, in response to the Report, FDA announced its "Closer to Zero: Action Plan for Baby Foods," a comprehensive multi-year plan identifying actions *to be taken by FDA* "to reduce exposure to arsenic, lead, cadmium, and mercury from foods eaten by babies and young children—to as low as possible." Dkt. 189-4 at 7, 189-7. The action plan recognizes that "[r]educing levels of toxic elements in foods is complicated and multifaceted," and that it is "crucial" that measures taken not have unintended harmful consequences such as eliminating from the marketplace certain foods and, therefore, the nutrients in those foods. Dkt. 189-13 at 3. In announcing its plan, FDA stated that it is committed to a "science-driven, transparent, and inclusive process that

will include active stakeholder engagement and public sharing of data and information." Dkt. 189-7 at 3.

The action plan has four specific stages: (1) evaluating the scientific basis for action levels for inorganic arsenic, lead, cadmium, and mercury, including establishing an interim reference level for certain elements as appropriate; (2) proposing action levels for certain elements in categories of baby foods and other foods commonly eaten by babies and young children; (3) consulting with stakeholders regarding proposed action levels; and (4) finalizing those levels. *Id*. at 3-4.

FDA set a timeline for completing its work and during the pendency of this action, has already completed significant steps, including:

- Proposing an action level for lead in fruit juices of 10 ppb for apple juice on a single-strength basis and an action level of 20 ppb for other single-strength juice types, including blends that contain apple juice;[4]

---

[4] *See* FDA, Draft Guidance: Action Levels for Lead in Juice, at 5 (Apr. 2022), https://tinyurl.com/4hc49ste.

- Making significant progress in evaluating interim reference levels for inorganic arsenic and cadmium and will propose draft action levels for inorganic arsenic and cadmium;[5] and

- Issuing draft guidance on lead in foods intended for babies and young children.[6] The Draft Lead Guidance proposes action levels for lead in foods intended for babies and young children:

  o 10 parts per billion (ppb) for fruits, vegetables (excluding single-ingredient root vegetables), mixtures (including grain and meat-based mixtures), yogurts, custards/puddings, and single-ingredient meats;

  o 20 ppb for root vegetables (single ingredient); and

  o 20 ppb for dry infant cereals.

Draft Lead Guidance at 3.

In connection with the release of the draft lead guidance, the director of FDA's Center for Food Safety and Applied Nutrition, Susan Mayne, Ph.D., reiterated:

---

[5] *See Closer to Zero*, https://tinyurl.com/22kmtmbf.

[6] *See* Draft Lead Guidance, https://tinyurl.com/ybx68thj.

15

> The action levels in today's draft guidance are not intended to direct consumers in making food choices. To support child growth and development, we recommend parents and caregivers feed children a varied and nutrient-dense diet across and within the main food groups of vegetables, fruits, grains, dairy and protein foods [. . .] This approach helps your children get important nutrients and may reduce potential harmful effects from exposure to contaminants from foods that take up contaminants from the environment.

Press Release, FDA Announces Action Levels for Lead in Categories of Processed Baby Foods (Jan. 24, 2023), https://tinyurl.com/msheck2h (emphasis and quotation marks omitted).

FDA has thus endorsed the view that consumers should not cut any particular food out of their babies' diets and, instead, should continue to feed their children a varied diet across all food groups. Placing a court-ordered warning on food labels that instructs consumers that a food product is unsafe to eat because of the presence of heavy metals is not only incorrect but would also have the opposite effect of what FDA seeks to accomplish through Closer to Zero.

FDA has devoted significant scientific, medical, and regulatory resources to these important issues affecting the health and safety of our nation's infants and young children. Congress appropriated $14 million to FDA to support this work in 2022 (Dkt. 189-8 at 7), and FDA requested

an additional budget increase of $18 million for 2023. *See* Dkt. 189-9 at 17. FDA's Center for Food Safety and Applied Nutrition ("CFSAN") and its Toxic Elements Working Group ("TEWG")—which is composed of dozens of experts in toxicology, epidemiology, medicine, and many other fields—are hard at work addressing these important issues. Dkt. 189-10.

### D. Plaintiffs' Complaint

The Report was the impetus for plaintiffs' lawyers, beginning the day after it was issued, to file hundreds of consumer class actions against baby food manufacturers. Similar to the allegations made against other baby food manufacturers, the complaint contains unsupported, generalized, and conclusory allegations that Beech-Nut baby food products contain "elevated" levels of toxic heavy metals and are not safe for consumption. *See* A-26 ¶ 4, A-28 ¶¶ 9-10, and A-30 ¶ 15. Plaintiffs allege that Beech-Nut not only falsely advertised its baby food products as safe, healthy, and nutritious, but also that the product labels failed to disclose that the food may contain heavy metals and is not safe to consume. A-29 ¶ 11.

The complaint begins with an allegation that "[t]oxic heavy metals, such as arsenic, lead, cadmium, and mercury, have no health benefit. In

short, these toxic heavy metals are unfit for consumption." A-26 ¶ 1. It then further alleges that parents' and caregivers' expectations of the products were frustrated because they "reasonably understood and believed that the baby food they purchased for their babies would be safe, healthy, and suitable for consumption by infants and young children." A-26 ¶ 3; *see also* A-28 ¶ 9 ("reasonable parents and consumers trust manufacturers, like Beech-Nut, to sell baby food that is healthy, nutritious, suitable and safe for consumption"); A-29 ¶ 14 ("[a]s a result of Beech-Nut's misleading, deceptive, unfair, and/or false business practices and breached of warranties, at least tens of thousands of consumers paid for Beech-Nut Baby Foods that they thought were safe, healthy, nutritious, and suitable for consumption by their infants and young children, but which actually contained (or had a material risk of containing) toxic heavy metals"); A-29 ¶ 13, A-82 ¶ 106, A-106 ¶ 179, A-109 ¶ 193, A-112 ¶ 204. All the allegations are premised on the vague and unsupported contentions of the Report, and not on any scientific, medical, or other reliable data or studies.

Despite the clearly differing underlying factual premise of their claims, plaintiffs argue that this case "solely concerns warranties and

18

whether they were breached and deceptive packaging and whether reasonable consumers were misled by Beech-Nut's concealment of material facts under state law." Opening Br. 40. Plaintiffs are wrong. To resolve their claims, it is necessary to first determine whether the challenged products are in fact *safe* or *adulterated*, as confirmed by the relief they seek:

- Monetary damages associated with plaintiffs' purchase of unsafe (adulterated) baby food;

- An injunction prohibiting Beech-Nut from labeling or stating in any manner that its products are safe to eat;

- An injunction requiring a warning label to consumers about the presence of heavy metals in the products; and

- A recall of existing Beech-Nut products.

A-292-294.

## SUMMARY OF ARGUMENT

The district court correctly applied the primary jurisdiction doctrine and dismissed this case. As plaintiffs concede, "two primary justifications exist for the application of the doctrine—the material need for agency expertise and a desire for uniformity of decisions between

courts and the applicable agency." Opening Br. 24 (citing *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002)). Both justifications exist here. As a result, the factors outlined by this Court in *Ellis*, 443 F.3d at 82-83, support applying the doctrine of primary jurisdiction.

**First**, the gravamen of plaintiffs' claims is that Beech-Nut baby food is not safe to consume. Determining the safety, healthiness, or nutritiousness of baby food because of the presence of naturally present, trace amounts of one or more heavy metals—and what warning should be included, if any—is an issue requiring FDA's unique expertise. That issue falls squarely within the agency's authority and discretion to regulate safety and labeling of foods.

**Second**, there is a substantial danger of inconsistent rulings if the Court does not defer to FDA's primary jurisdiction. Failing to defer to FDA on the safe levels of heavy metals in baby foods, and on issues concerning labeling, poses a danger that the Court's determination would be inconsistent with FDA's and with that of other courts.

**Third**, the Report constitutes an application to FDA on behalf of the public and industry. As a result of the Report, the relevant

governmental agency (FDA) has taken up the specific question that was before this Court. Deferring in these circumstances serves this Court's stated purpose of ensuring that courts and FDA do not work at cross-purposes.

*Finally*, resolution of this case will not be needlessly delayed by awaiting completion of FDA's work. In fact, the work has begun and guidance has already been issued. The fact that FDA is undertaking a time-consuming and careful scientific review of food and heavy metals *supports* deference to FDA. How best to tackle heavy metals in food is not a question that has a simple or quick answer, and plaintiffs cannot identify any harm that will come to them if the primary jurisdiction doctrine is applied.

## STANDARD OF REVIEW

The standard of review "of a dismissal on the basis of the primary jurisdiction doctrine is essentially *de novo*." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022) (emphasis added) (cleaned up) (quoting *Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 222 (2d Cir. 1995)).

On a primary-jurisdiction motion, "matters outside the pleadings are properly considered." *See Canale v. Colgate-Palmolive Co.*, 258 F.

Supp. 3d 312, 324 n.11, 326 (S.D.N.Y. 2017). The Court may take judicial

notice of the documents referenced in this brief because they are either

(1) incorporated by reference because they are found in sources cited and

relied on in the complaint, or (2) matters of public record, court records,

and/or published by FDA. *See Samuels v. Air Transp. Loc. 504*, 992 F.2d

12, 15 (2d Cir. 1993) (on 12(b)(6) motion, courts may consider documents

"incorporated by reference in the pleadings"); *Simon v. Smith & Nephew,*

*Inc.*, 990 F. Supp. 2d 395, 401 n.2 (S.D.N.Y. 2013) (taking judicial notice

of "public records contained on the FDA website").

## ARGUMENT

### I. The District Court Properly Applied The Primary Jurisdiction Doctrine To Dismiss the Complaint.

"Primary jurisdiction is a prudential doctrine that permits courts

to determine that an otherwise cognizable claim implicates technical and

policy questions that should be addressed in the first instance by the

agency with regulatory authority over the relevant industry rather than

by the judicial branch." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753,

760 (9th Cir. 2015) (quotation marks omitted). "The primary jurisdiction

doctrine allows courts to stay proceedings or to dismiss a complaint

without prejudice pending the resolution of an issue within the special

competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).

"[T]he doctrine's central aim is to allocate initial decision-making responsibility between courts and agencies and to ensure that they do not work at cross-purposes." *In re KIND LLC "Healthy & All Natural" Litig.*, 209 F. Supp. 3d 689, 693, 694-97 (S.D.N.Y. 2016) (quoting *All Am. Tel. Co. v. AT&T, Inc.*, 2010 WL 7526933, at *1 (S.D.N.Y. Jan. 19, 2010)) (staying false advertising claims relating to "natural" statement because FDA was evaluating how to define and regulate "natural"). Overall, the "doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within the regulatory regime." *Ellis*, 443 F.3d at 82 (quotation marks omitted).

Courts generally consider four factors in determining whether to apply the primary jurisdiction doctrine: (1) whether the issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made. *Ellis*, 443 F.3d at 82-83. As plaintiffs recognize, two justifications exist for applying the primary jurisdiction doctrine: (1) the need for agency expertise; and (2) uniformity of decisions between courts and the applicable agency. Opening Br. 24 (citing *Tassy*, 296 F.3d at 68).

As discussed more fully below, applying the *Ellis* factors, the district court properly found that the subject matter of this lawsuit was within the primary jurisdiction of the FDA and deferral was appropriate pending agency action through the Closer to Zero program. SPA-9-12.

## A. FDA's Work On Closer To Zero Will Directly Impact The Resolution Of Plaintiff's Claims.

Plaintiffs' primary argument against the application of the primary jurisdiction doctrine is their baseless assertion that nothing about FDA's regulatory authority over food safety and food labeling or the Closer to Zero program will impact their claims.[7] *See, e.g.*, Opening Br. 28-31, 33.

---

[7] If plaintiffs are really only alleging a garden-variety omission claim for failing to disclose the presence of heavy metals, that claim fails. *See Paradowski*, 2023 WL 3829559, at *3 (no duty to disclose the potential presence of heavy metals in pet food because heavy metals are ubiquitous and the information that the ingredients in pet foods may contain heavy metals was reasonably obtainable by plaintiffs).

But as the district court correctly held, "[c]ontrary to plaintiffs' assertion that this case is a 'garden variety' false advertising case, their claims repeatedly assert that Beech-Nut's products are 'unsafe' to consume and that it is the products' underlying toxicity, not the label statements themselves, that cause any alleged injuries [. . .] resolving plaintiffs' claims first requires a determination on whether the levels of heavy metals in Beech-Nut's products is harmful, which is within the FDA's field of expertise." SPA-9-10. The district court is correct.

The complaint is wholly dependent on assertions that the products, as currently permitted to be sold by FDA, are "unsafe" and unsuitable to consume, and that the underlying alleged toxicity of the products themselves is the cause of plaintiffs' alleged injuries. A-29 ¶ 12 ("[t]he presence and risk of toxic heavy metals rendered the Beech-Nut Baby Foods unfit for their intended purpose and use, defective, and worthless, and denied consumers the benefit of their bargain."). Indeed, the first line in plaintiffs' opening brief makes clear that this case is about "children's health and safety," and the brief itself reveals that the issue at the heart of this case is whether the challenged products are safe to consume. *See* Opening Br. 1, 31; *see also id*. 4, 11-13, 16-18, 38-39.

25

Because food safety and nutrition are front-and-center in this matter and in nearly all the cases against baby food manufacturers, other courts have also concluded that deferring to FDA's primary jurisdiction is appropriate. For example, a district court in Virginia found that because "no tolerance level has been set and no labeling requirement exists for Heavy Metals in Defendant's Baby Food Products," it would be "unable to conclude whether Defendant's labeling was misleading without guidance from the FDA on the Heavy Metals' toxicity." *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, 2022 WL 10197651, at *13-15 (E.D. Va. Oct. 17, 2022). The district court also emphasized that resolving the issues raised in the complaint would involve addressing important policy considerations, such as limiting access to foods with significant nutritional benefits or making them unavailable or unaffordable to many families. *Id.*

Similarly, in *Kimca v. Sprout Foods, Inc.*, 2022 WL 3586095 (N.J. Super. Ct. Law Div. Aug. 5, 2022), a state court in New Jersey found that the questions of what levels of heavy metals in baby foods are safe and acceptable, and whether it is misleading for foods containing certain levels of heavy metals to make true labeling statements about their

26

contents, "present 'technical matter[s] involving complex chemical considerations' that are uniquely within the FDA's expertise." *Id.* at *3 (quoting *Coyle v. Hornell Brewing Co.*, 2010 WL 2539386, at *4 (D.N.J. June 15, 2010)). The court reasoned that FDA has the requisite expertise to evaluate research about levels of heavy metals in baby foods and what can be considered safe "and whether consumers should be informed of its presence through labeling." *Id.* (quoting *Tran v. Sioux Honey Ass'n*, 2017 WL 5587276, at *3 (C.D. Cal. Oct. 11, 2017)) Calling it a "false distinction," the court proceeded to reject plaintiffs' argument that FDA's work on action levels was distinguishable from their labeling claims, because "[p]laintiffs' labeling claims are premised on the idea that any level of heavy metals in the products is unsafe." *Id.*

And these courts are not outliers.[8] For example, in *Quidera v. Blackstone Labs, LLC*, the court stayed claims alleging an ingredient

---

[8] The one exception is *In re Plum Baby Food Litig.*, 2023 WL 3493319 (N.D. Cal. May 3, 2023), which is not persuasive. The *Plum* decision relied on the plaintiffs' assertion that, unlike any of the other cases against baby food manufacturers, they were not challenging the safety of the products. *Id.* at *3. Instead, that case is purportedly only about "labeling" of the mere presence of heavy metals (*i.e.*, should food that is not unsafe be required to bear a warning label informing consumers about heavy metals). *Id.* at *1. Accordingly, in *Plum* the district court

called DMHA was unsafe based on FDA's primary jurisdiction because "[d]etermining based on science whether DHMA is safe . . . is a particularly complicated issue that Congress has committed to . . . FDA." 2021 WL 4958789, at *3 (S.D. Fla. Mar. 8, 2021) (quotation marks omitted). The court emphasized "[t]his type of weighing extensive chemical, technical, and scientific analysis is readily distinct" from simple labeling claims. *Id*.

Against the weight of these decisions, plaintiffs rely on the assertion that there is no reason to defer to FDA's expertise here because agency policy regarding heavy metals is "clearly established" since certain action levels already exist. Opening Br. 35-39; *see also id.* at 42 (citing *Gavilanes v. Gerber Prods. Co.*, 2021 WL 5052896 (E.D.N.Y. Nov. 1, 2021) (the justification for primary jurisdiction is undermined where an FDA policy is clearly established because "there is little risk that the courts will undermine the FDA's expertise."). That is not the case here because Closer to Zero is not "clearly established" agency policy because

wrongly determined that FDA's determinations about the heavy metals in the food supply and Closer to Zero would not impact the "key issues" in that case. *Id.* at *2. But food labeling and how to communicate to consumers about food safety and nutrition is directly impacted by Closer to Zero.

FDA has not yet completed its work regarding specific heavy metal levels in baby food. Accordingly, there is a substantial risk that a court's decision could undermine FDA's expertise.

Plaintiffs' argument that action levels set by FDA through Closer to Zero cannot materially aid the district court also misses the mark. *See* Opening Br. 43-44. If FDA determines that the best framework by which to determine food safety is by setting action levels, then that is instructive. Moreover, FDA has confirmed that it will monitor and enforce the action levels that it sets, and that it will reduce levels of heavy metals in food by "increasing targeted compliance and enforcement activities." Dkt. 189-7 at 2, 4.[9] Action levels are thus one piece of the framework FDA is establishing that will help to inform the analysis of whether the products are safe, which is at the core of this dispute. *See Kimca*, 2022 WL 3586095, at *3 ("guidance from the FDA on what constitutes a safe level of heavy metals in baby food is integral to

---

[9] *See also* Draft Lead Guidance at 4 ("Consistent with 21 CFR 109.6(d), these action levels reflect levels of lead at which FDA may regard the food as adulterated within the meaning of section 402(a)(1) of the Federal Food, Drug, and Cosmetic Act (FD&C Act). We intend to consider these action levels, in addition to other factors, such as our confidence in a measured analytical value, when considering whether to bring enforcement action in a particular case.").

determining whether any of Sprout's label statements were misleading.").

Even if deferring to FDA's primary jurisdiction is appropriate, plaintiffs contend that the district court erred by failing to carve-out a subset of plaintiffs' allegations that relate to allegedly excessive levels of inorganic arsenic in certain rice cereal and to lead generally. *See* Opening Br. 35-39. But that ploy lacks merit and is inconsistent with the complaint and the arguments made in the opening brief. This case constitutes a portfolio-wide attack on heavy metals in dozens and dozens of Beech-Nut products. It would be inefficient and imprudent to permit a narrow slice of claims to proceed while the rest of the case remains dismissed, particularly where defenses are likely to overlap and hinge on future determinations from FDA.

For example, while cinnamon may be an ingredient in certain of the challenged baby food products, a determination of whether the Beech-Nut products are safe and not adulterated is required for plaintiffs' claims, not just insinuations about individual raw ingredients.[10]

---

[10] Significantly, plaintiffs claim that Beech-Nut has used ***ingredients*** containing lead in excess of FDA's Draft Guidance. Opening Br. 38-39.

Plaintiffs' assertions regarding alleged levels of inorganic arsenic in rice

cereal are equally specious. Opening Br. 24-25. There are no allegations

that any plaintiff purchased a product that was subject to a recall,[11] and

this claim is admittedly hypothetical based on the assertion that it is

theoretically possible that rice cereal with levels of inorganic arsenic

could have possibly been sold in the past. Opening Br. 24-25.[12]

---

But, as FDA has made clear, foods covered by the draft guidance are "***food packaged in jars, pouches, tubs, and boxes*** [. . .] **It does not include raw agricultural commodities**." Draft Lead Guidance at 3 n.1 (emphasis added). That is because products may contain very tiny amounts of component raw ingredients (like cinnamon) that would not impact the overall levels of heavy metals in the final product.

[11] The Supplemental Report claims that Alaska found elevated arsenic levels ***across only six*** Beech-Nut product codes and the recall pertained only to certain of those lots. *See* H. Subcomm. on Econ. & Consumer Policy Comm. on Oversight & Reform, Staff Report: New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods, at 5, 8-9 (Sept. 29, 2021), https://tinyurl.com/2sdm47nh.

[12] In addition, this allegation is insufficient to confer standing in absence of well pleaded allegations that the product contained those heavy metals at a level that was in fact harmful. By failing to allege that any product they purchased contained lead or arsenic in excess of the levels set by FDA, plaintiffs have failed to allege standing. *See In re Plum Baby Food Litig.*, 637 F. Supp. 3d 210, 231-32 (D.N.J. 2022) (the potential presence of heavy metals in baby food does not establish an injury-in-fact direct and concrete to establish Article III standing); *Kimca v. Sprout Foods, Inc.*, 2022 WL 1213488, at *6-9 (D.N.J. Apr. 25, 2022) (same); *Gerber*, 2022 WL 10197651, at *8 (same); *see also Doss v. Gen. Mills, Inc.*, 2019 WL 7946028, at *2-3 (S.D. Fla. June 14, 2019), (no standing where plaintiff alleged Cheerios "contained or *could contain* glyphosate"

Finally, plaintiffs assert that "new evidence" shows that FDA's ongoing work is of no relevance to their claims because Closer to Zero is not going to address "product labeling requirements to inform parent's food choices." Opening Br. 34; *see also id.* 5, 25, 33. But plaintiffs are incorrect. FDA's ongoing work will be highly relevant to plaintiffs' claims because it will inform whether and to what extent the risk of trace amounts of naturally occurring heavy metals in baby foods is acceptable, and also whether baby food can be considered safe and suitable for consumption if it contains certain amounts of naturally occurring heavy metals. Moreover, even if FDA opts not to act via requiring warning labels, that in itself demonstrates that plaintiffs' requested framework for addressing naturally occurring heavy metals in baby food has been considered—and rejected—by FDA, within whose province the labelling

---

(quotation marks omitted)), *aff'd*, 816 F. App'x 312 (11th Cir. 2020) (per curiam); *Pels v. Keurig Dr. Pepper, Inc.*, 2019 WL 5813422, at *5 (N.D. Cal. Nov. 7, 2019) (no standing where plaintiff "fail[ed] to plead the water *he* purchased contained violative arsenic levels"); *In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 397 F. Supp. 3d 406, 423 (S.D.N.Y. 2019) (plaintiffs "must allege that *their* product *actually exhibited* the alleged defect" (quoting *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014))); *Phan v. Sargento Foods, Inc.*, 2021 WL 2224260, at *4 (N.D. Cal. June 2, 2021) (granting motion to dismiss because plaintiff could not establish that relied on test was representative of all products).

of these products lies. There is nothing new about the quote from Susan Mayne, Ph.D., director of FDA's Center for Food Safety and Applied Nutrition that supports plaintiffs' position—other than the fact that plaintiffs take it out of context. FDA's point is the opposite of what plaintiffs seek in this case. FDA is reiterating that the presence of heavy metals in baby food should *not* be a factor in determining what food children should eat, and that warning labels certainly have no place on what FDA considers safe and nutritious food.

While action levels are a method for FDA and industry to manage and reduce overall exposure to heavy metals from foods, FDA does not want consumers to be concerned about action levels or to make purchasing decisions based on action levels. FDA has made a scientific, reasoned, and explicit decision that the mere presence of heavy metals does not render food unsafe, and that there is no reason to avoid consuming prepackaged baby food (or any other foods made from the same ingredients). Plaintiffs' attempt to commandeer FDA's role to regulate food safety and food labeling under the guise of state consumer protection law is preempted because it conflicts with federal law and

supremacy.[13] *See Red v. Gen. Mills, Inc.*, 2015 WL 9484398, at \*7 (C.D. Cal. Dec. 29, 2015) ("Congress granted the FDA authority to comprehensively regulate food safety.").

Plaintiffs' disappointment with the manner FDA has chosen to manage heavy metals in the food supply is not sufficient to form the basis of an actionable claim. Permitting plaintiffs and their counsel to act as FDA, under the guise of state law, to set their own requirements and ban trace amounts (or the risk) of heavy metals altogether or to find, retroactively, that baby food products should not have been sold or should

---

[13] Where a federal regulatory agency like FDA regulates in an area of its expertise pursuant to a legal mandate (food safety), state law may not be used to bar conduct the agency has chosen not to prohibit. Otherwise, the threat of civil liability would erect an obstacle to the comprehensive and carefully calibrated federal regulatory program's accomplishment. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000) (federal law that required a percentage of new cars to employ passive-restraint systems impliedly preempted state tort claims that would have had effect of requiring auto manufacturers to install air bags in all new cars); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (conflict preemption where state law limited availability of an option that federal agency thought appropriate to ensure its overall regulatory objectives); *Backus v. Nestlé USA, Inc.*, 167 F. Supp. 3d 1068, 1072-73 (N.D. Cal. 2016) (tort suit imposing liability for presence of ingredient in food would impose liability for something federal law permitted); *Cohen v. Apple Inc.*, 46 F.4th 1012, 1027-31 (9th Cir. 2022) (conflict preemption where state law claims could establish testing requirements and standards that conflicted with the uniform standards and testing established by the FCC); *Farina v. Nokia Inc.*, 625 F.3d 97, 123-27 (3d Cir. 2010) (same).

have a warning label, would "disrupt the expert balancing underlying the federal scheme," especially where, as here, there is no scientific basis for such relief. *See Farina v. Nokia Inc.*, 625 F.3d 97, 126 (3d Cir. 2010).

### B. Making Determinations About The Safety And Appropriate Labeling Of Baby Food Involves Technical And Policy Considerations Uniquely Within FDA's Mandate And Purview.

FDA's primary mandates include enacting and enforcing regulations to protect the safety of the food supply and ensuring that food labels provide consumers with all relevant and necessary nutritional information. *See* 21 U.S.C. § 371, 393(b)(2)(A); 21 C.F.R. § 7.1 *et seq.* Accordingly, there can be no question the complex and multi-disciplinary issue of how to educate the public and to manage the presence of trace amounts of ubiquitous heavy metals in food falls squarely within FDA's jurisdiction.

Courts have repeatedly held that technical scientific questions like food safety, how to manage the national food supply, and how to educate and inform the public about food, are far better addressed by regulatory agencies than by class action litigation. *See Physicians Comm. for Responsible Med. v. Gen. Mills, Inc.*, 2006 WL 3487651, at *6 (E.D. Va. Nov. 30, 2006) (dismissing false advertising claims on primary

jurisdiction grounds because "FDA is better suited to address the scientific issue of the effects of dairy product consumption on weight gain and fat burning"); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 934 (N.D. Cal. 2015) (applying the primary jurisdiction doctrine because "[w]hether a body of evidence sufficiently demonstrates that a particular amount of a chemical substance poses a serious public health risk is precisely the kind of expert question that agencies are better suited to answer than courts or juries."); *Quidera*, 2021 WL 4958789, at *3 ("[t]his type of weighing extensive chemical, technical, and scientific analysis is readily distinct" from simple labeling claims). That is because regulatory agencies like FDA are uniquely situated for this complex scientific task.

FDA possesses years of testing data to consult, employs thousands of scientists and doctors, and has millions of dollars from Congress allocated to these specific issues. FDA can draw resources and utilize data and information from various sources to which the Court and jurors do not have access.[14] Moreover, FDA considers broader policy factors,

---

[14] Because the impact of the presence of heavy metals in the food supply is complex, FDA recognizes that "well-designed studies are essential for developing risk/benefit assessments and mitigation strategies." Dkt. 189-12 at 26-27. FDA will conduct its own testing,

such as assessing the feasibility of making commercial baby food that meets its contemplated specifications, ensuring children get the nutrition they need, and ensuring the supply of *affordable* baby food so that infants and young children can acquire the nutrition that their growing bodies and minds requires.

The importance of this broad perspective cannot be overstated. Plaintiffs here appear to suggest that ***any*** level of heavy metals is unsafe. Such a position is scientifically indefensible, but more importantly, it would result in a complete lack of supply of nutritious, affordable baby food for families to feed their children. Since trace amounts of heavy metals are present nearly everywhere, such nutritious foods would be totally unavailable to consumers, in both manufactured and homemade foods. That is precisely why FDA, and not the courts, should determine how best to regulate food safety in the first instance.

FDA is uniquely capable of taking into consideration competing factors like food safety, the adequacy of the food supply, and the fact that alleged elements are omnipresent in the environment (air, water, soil)

---

"develop[] and validat[e] analytical methods," conduct "[t]oxicological research," and "[d]evelop[] new dose-response models." Dkt. 189-7 at 8.

and then synthesizing these factors into feasible and achievable regulations and/or formal guidance. Dkt. 189-3 at 2 ("By taking into consideration issues related to feasibility and achievability, the FDA can help to ensure equitable availability of safe and nutritious foods for all babies and young children."); *see also Clark*, 523 F.3d at 1114-16 (applying primary jurisdiction doctrine where plaintiff's claim "implicat[ed] technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch").

**C.** **There Is A Substantial Danger Of Inconsistency If The District Court Makes Its Own Independent Determination Regarding Heavy Metals Separate From FDA.**

The rationale underlying the primary jurisdiction doctrine "includes a concern for maintaining uniformity in regulation of an area entrusted to a federal agency." *Ellis*, 443 F.3d at 82. "[T]he doctrine seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within the regulatory regime." *Id.* (cleaned up). As is the case here, "[c]ourts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues." *Id.* at 88.

Contrary to plaintiffs' assertions, *see* Opening Br. 45-46, there is a significant risk of inconsistent rulings between the district court and FDA **in *this* case**. There is no way for the district court to know whether its ruling will be consistent with FDA's ultimate pronouncement on any issue related to heavy metals in baby food through the Closer to Zero program. *See* SPA-10-12; *see also Kimca*, 2022 WL 3586095, at *4 ("failing to defer to the FDA on the safe levels of heavy metals in baby foods, and the proper labeling, poses a danger that a court's determination 'will be inconsistent with that of other courts or with the FDA itself.'" (quoting *Coyle*, 2010 WL 2539386, at *4)).

"Because an agency 'is currently conducting an investigation into the lawfulness of the [practice] under attack,' 'to permit the court below initially to determine [the issue] would invite the very disruption . . . that the doctrine is meant to discourage.'" *Ellis*, 443 F.3d at 88 (quoting *Danna v. Air France*, 463 F.2d 407, 412 (2d Cir. 1972)). Deferring to FDA's primary jurisdiction (while other courts have done the same) will help to avoid a "patchwork of decisions that vary by location, court, manufacturer, and product, resulting in different labeling standards for substantially similar baby food products." *Gerber*, 2022 WL 10197651, at

39

*14; *accord Kimca*, 2022 WL 3586095, at *4. Permitting multiple courts to act separately in consumer class actions pending across the country— and to come up with their own rules and standards for food safety and food labeling—would place national uniformity, that is crucial to the safety and organized operation of the U.S. food supply, in significant jeopardy. The fact that FDA may then weigh in with conflicting determinations of food safety and labeling requirements would serve only to inject more consumer confusion. Indeed, FDA has warned that contradictory guidance could result in "unintended consequences" like "nutrient deficiencies and potential poor health outcomes" if science-based, nationwide standards are not set. Dkt. 189-3 at 2, 4.

If this Court were to rule otherwise, Beech-Nut, for example, would be subjected to requirements by this Court that are different from the decisions of other courts on the exact same questions, and from FDA itself, thereby resulting in different labeling standards for identical baby food products. Such a result would place Beech-Nut in the precarious position of being subject to differing requirements from its regulatory agency (FDA) and a court order, or various court orders.

It is thus clear that dismissing this action until FDA offers guidance at the federal level would almost certainly help harmonize court rulings—an important consideration in view of the fact that Congress "[did] not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide." *In re KIND LLC "Healthy and All Natural" Litig.*, 209 F. Supp. 3d at 696 (quotation marks omitted); *Haggag v. Welch Foods, Inc.*, 2014 WL 1246299, at *6 (C.D. Cal. Mar. 24, 2014) ("when the FDA acts, its actions affect an entire industry" and finding "decisions as to implied health claims are best left to the FDA, which can determine such claims uniformly"); *see also Physicians Comm. for Responsible Med.*, 2006 WL 3487651, at *6 (dismissing case under the primary jurisdiction doctrine because "there is clearly a risk of inconsistent judgments" where parallel determinations are being made by courts and FDA).

**D.    The Report Is An Application To FDA On This Specific Topic On Behalf Of The Public And Industry.**

Plaintiffs' assertion that the fourth *Ellis* factor has not been met puts form over substance. The fourth *Ellis* factor, whether a prior application has been made to the regulatory agency, only weighs against application of primary jurisdiction where "there is no pending proceeding

before the agency, and there is no indication that the agency is poised to take up the specific questions before us, meaning that there is minimal, if any, concern that a court will resolve plaintiffs' claims and fashion a remedy in a way that would work at a 'cross-purpose' with [a governmental agency's] actions." *Palmer*, 51 F.4th at 511. While Beech-Nut does not dispute that *it* was not responsible for making the application to FDA that resulted in the Closer to Zero Action plan, the fact that the agency is poised to take up and *actually is taking up* the specific questions raised by this lawsuit is determinative, and that this issue was referred by the Subcommittee and not Beech-Nut is not determinative. Since FDA has taken up the specific question before this Court, deference serves this Court's stated purpose of ensuring that the courts and FDA do not work at cross-purposes.

FDA is formally and ***currently*** working to determine how best to address trace amounts of heavy metals in baby foods and to set additional action levels, as needed. Dkt. 189-5 at 1-2. FDA has already published draft guidance on lead in fruit juices, and published draft guidance for action levels for lead in baby food based on the type of ingredient (further highlighting the complexity of the subject matter). FDA is continuing to

evaluate the science to establish interim reference levels for inorganic arsenic and cadmium, and projects that it will have draft guidance available for interagency review in 2024. And FDA is studying the role of seafood consumption in child growth and development as it proceeds with its work to develop guidance regarding mercury.[15] Only upon completion of FDA's work will there be a proper scientific record and regulatory framework—including, as applicable, FDA-issued compliance standards and safe harbors.

### E. Resolution Of Plaintiffs' Claims Will Not Be Needlessly Delayed.

Although it will take time for FDA to complete its work on Closer to Zero, that fact alone does not support a finding that the primary jurisdiction doctrine is inapplicable. *See Ellis*, 443 F.3d at 90 (stating that while courts have sometimes refused to defer to an agency's primary jurisdiction in a case where agency referral would result in undue delay, "more recently, we have noted that such considerations of judicial economy should not be considered because 'the Supreme Court has consistently held that there are only two purposes to consider in

---

[15] *See Closer to Zero*, https://tinyurl.com/22kmtmbf.

determining whether to apply the primary jurisdiction doctrine—uniformity and expertise.'" (quoting *Tassy*, 296 F.3d at 68 n.2)). Indeed, the fact that FDA is undertaking a massive scientific review of food and heavy metals that is taking some time ***supports*** deference to FDA because how best to tackle heavy metals in food is not a question that has a simple or quick answer, nor is it a question that would be proper for a jury to decide.

Plaintiffs contend that the district court erred in balancing the advantages and disadvantages because it considered the merits of plaintiffs' allegations. Opening Br. 48. That is incorrect. The district court found that permitting the case to proceed would result in increased costs and complications because forthcoming FDA pronouncements could render the case moot—stating, in essence, that FDA is simultaneously looking at the same issues at the core of this case, and once FDA applies its expertise, its guidelines will inform the outcome here. Courts, including the district court, routinely look to whether a regulatory agency is simultaneously "addressing issues within their domain" to determine whether primary jurisdiction should be applied. *Ellis*, 443 F.3d at 92.

Plaintiffs cannot identify any harm that will come to them if the courts defer to FDA's primary jurisdiction. As plaintiffs concede, their claims are about "past damages"; plaintiffs thus cannot identify a single cost or complication that follow if the doctrine is applied. Nor will physical harm result; FDA has repeatedly stated that there are no safety issues with commercial baby foods and that consumers should continue to feed them to their children.

***Not*** dismissing the case, however, would result in increased cost and complications. As the district court held, "not applying the doctrine to this case will also result in increased costs and complications because it will force the parties to litigate a case that forthcoming FDA pronouncements will likely render moot." SPA-12. Accordingly, "this factor, to the extent that it can be afforded much weight, *see Tassy*, 296 F.3d at 68 n.2, does not decisively favor" plaintiffs' position. SPA-12.

## CONCLUSION

This is not a garden variety false advertising case. Instead, the complaint implicates technical and policy considerations that are uniquely in FDA's purview and permitting this case to proceed risks inconsistent rulings that threaten to disrupt national uniformity in food

labeling and safety. For the reasons set forth above, including that deferring to FDA's primary jurisdiction serves the doctrine's dual justifications of the need for agency expertise and uniformity of decisions between the courts and FDA, this Court should affirm the decision of the district court.

Respectfully submitted,

*s/ Ashley C. Parrish*

Keri E. Borders
Rebecca B. Johns
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
kborders@kslaw.com
rjohns@kslaw.com

Ashley C. Parrish
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

Livia M. Kiser
KING & SPALDING LLP
110 North Wacker Drive
Suite 3800
Chicago, IL 60606
(312) 995-6333
lkiser@kslaw.com

*Counsel for Appellee Beech-Nut Nutrition Company*

September 1, 2023

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,352 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

Date: September 1, 2023

*s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Defendant-Appellee*
*Beech-Nut Nutrition Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 1, 2023, an electronic copy of the foregoing Brief for Appellee was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

*s/ Ashley C. Parrish*
Ashley C. Parrish

*Counsel for Defendant-Appellee*
*Beech-Nut Nutrition Company*