# 23-0220-cv

# United States Court of Appeals

*for the*

# Second Circuit

---

JORDAN WHITE, ROBERT PARTELLO, ERIN ABDOO, BRIDGET
SALOPEK, OLIVIA BOYER, REBECCA GEORGE, CORINTHEA
PANGELINAN, ELIZABETH AUSTIN, STEPHANIE NORGAARD,
AMANDA SCHRAM, LATOYA MCHENRY, ERICA DOUGLAS,
TABITHA LATTEYER, MORGAN ENGEBRETSEN,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS
## AND CONSUL PLAINTIFFS-APPELLANTS

---

ERIN GREEN COMITE
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 South Main Street
P.O. Box 192
Colchester, Connecticut 06415
(860) 537-5537

– and –

STEVEN L. BLOCH
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
(203) 325-4491

*Attorneys for Plaintiffs-Appellants and
Consul Plaintiffs-Appellants*

---

CP COUNSEL PRESS    (800) 4-APPEAL • (323786)

MCGLINCHKALI, AMANDA ROGERS, MAURICE PETERSON, SHEILA
CURRY, KATHERINE MCGIBNEY, NATALIE FRANCOIS, HEATHER
MALAGA, TAMAYA STEVENSON, LIZA SIKE, KARLEEN KOZACZKA,
MAYELIN CARRANZA, ANA BUTKUS, MONIQUE WARREN, CELIA
BRUNO, SAMANTHA CLARK, ELIZABETH MCDOWELL, JILL HAYDEN,
BRANDI SLABINSKI, KELSEY BLANKENSHIP, SAMMI HOBDY, LISA
FISHER, PORSCHE STOKES, MELANIE COLE, KINDER SMITH,
LOUKEVIA MOORE, XENA ALMQUIST, NATHAN EDWARDS, SHAYLAN
ISAACS, ALBACHIARA FARCI, AMBER WRIGHT, CHRISTEN ZULLI,
KRISHNA PATEL, DERRICK CARR, MALIK HOCKADAY, ASHLEY
YATES, CHARITA HARRELL, BRITTANY WALLACE, ANDREW LOHSE,
ADRIANNE COOPER, ALYSSA MEGAN BARB, REBECCA ABBOTT,
CHRISTINA MITCHELL, BRITTNEY MOYER, AMANDA HOLMES,
AMANDA BOOTS, DILLON TOWNZEN, NATALIE WILLIAMS,
CHRISTINA ALLGOOD, AKA Christina Holland,

*Plaintiffs-Appellants,*

JEREMY CANTOR, On behalf of themselves and all others similarly situated,
HEATHER HYDEN, On behalf of themselves and all others similarly situated,
HALEY SAMS, On behalf of themselves and all others similarly situated, VITO
SCAROLA, On behalf of themselves and all others similarly situated, EMILY
BACCARI, On behalf of themselves and all others similarly situated, JILLIAN
GEFFKEN, On behalf of themselves and all others similarly situated,
KAITLYNN CARSON, On behalf of themselves and all others similarly situated,

*Consul Plaintiffs-Appellants,*

LAURIE THOMAS, Individually and on behalf of all others similarly situated,
ALISON KAVULAK, Individually and on behalf of all others similarly situated,
JEN MACLEOD, Individually and on behalf of all others similarly situated,
MARY NARVAEZ, Individually and on behalf of all others similarly situated,
ALISON FLEISSNER, Individually and on behalf of all others similarly situated,
EMILY BIGAOUETTE, Individually and on behalf of all others similarly
situated, LAURA EGGNATZ, Individually and on behalf of all others similarly
situated, TERESA HAGMAIER, Individually and on behalf of all others similarly
situated, NICOLE FALLON, Individually and on behalf of all others similarly
situated,

*Plaintiffs,*

LAURA PEEK, Individually and on Behalf of All Others Similarly Situtated,
ROBYN MOORE, Individually and on Behalf of All Others Similarly Situtated,
GABRIELLE STUVE, Individually and on Behalf of All Others Similarly
Situtated, MATTIA DOYLE, on behalf of himself and all other similarly situated,
LEE BOYD, Individually and on Behalf of All Others Similarly Situtated,
ASHLEY ALLEN, On behalf of themselves and all others similarly situated,
DOMINICK GROSSI, On behalf of themselves and all others similarly situated,
ANTHONY HARRISON, On behalf of themselves and all others similarly
situated, NEISHA DANIELS, On behalf of themselves and all others similarly

situated, HEATHER MCCORMICK, On behalf of themselves and all others similarly situated, HANNAH GRANDT, On behalf of all others similarly situated, AMBER CAUDILL, On behalf of themselves and all others similarly situated, MICHAEL MOTHERWAY, Individually and on behalf of all others similarly situated, KATHEY HENRY, Individually and on behalf of all others similarly situated, KELSEY GANCARZ, Individually and on behalf of all others similarly situated, ATAHSIA SMILEY, Individually and on behalf of all others similarly situated, NAJAH A. HENRY, Individually and on behalf of all others similarly situated, CHANEL J. JACKSON, Individually and on behalf of all others similarly situated, ALEXIS DIAS, Individually and on behalf of all others similarly situated, HOLLY BUFFINTON, Individually and on behalf of all others similarly situated, CONSTANCE VENABLE, Individually and on behalf of all others similarly situated, TERESA WILSON, individually, and on behalf of all others similarly situated, RYAN SANDERS, individually, and on behalf of all others similarly situated, SUSAN CANADA, individually, and on behalf of all others similarly situated, TABATHA SIDI, individually, and on behalf of all others similarly situated, TIFFANIE SKIBICKI, individually, and on behalf of all others similarly situated, HEATHER AGE, individually, and on behalf of all others similarly situated, JOLINA MANLEY, individually, and on behalf of all others similarly situated, JESSICA DAVID, individually, and on behalf of all others similarly situated, CASSANDRA MARTELL, individually, and on behalf of all others similarly situated, MIESHIA DOUGLAS, individually, and, JESSICA LOGGINS, on Behalf of Herself and All Others Similarly Situated, ANA LYNETTE GREGORY ELDRIDGE, Individually and on behalf of all others similarly situated, EMILY ORSAK, on behalf of themselves and a class of all others similarly situated, JULIE CHATAGNIER, on behalf of themselves and a class of all others similarly situated, MARIE MEZILE, individually and on behalf of all others similarly situated, ALYSSA ROSE, on behalf of themselves and all others similarly situated, MYJORIE PHILIPPE, on behalf of themselves and all others similarly situated, MELISSA SISK, on behalf of themselves and all others similarly situated, VANESSA INOA, on behalf of themselves and all others similarly situated, ASYIA ANDREWS, individually and on behalf of all others similarly situated, STACIA CULLORS, an individual, L. C., through their guardian ad litem Stacia Cullors, V. C., through their guardian ad litem Stacia Cullors, ANTHONY BACANI, an individual, D. B., through their guardian ad litem Anthony Bacani, E. B., through their guardian ad litem Anthony Bacani, JENNIFER CULLORS, an individual, A. C., through their guardian ad litem Jennifer Cullors, J. C., through their guardian ad litem Jennifer Cullors, N. C., through their guardian ad litem Stacia Cullors,

*Consul Plaintiffs,*

— v. —

BEECH-NUT NUTRITION COMPANY,

*Defendant-Appellee.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................1

ARGUMENT .........................................................................................5

I.    THE PRIMARY JURISDICTION DOCTRINE IS INAPPLICABLE TO PLAINTIFFS' CLAIMS RELATING TO INORGANIC ARSENIC IN BEECH-NUT'S RICE CEREAL ...................................................5

II.   THE *ELLIS* FACTORS DO NOT SUPPORT APPLICATION OF THE PRIMARY JURISDICTION DOCTRINE ....................................11

     A.    Plaintiffs' Claims Are Within the Conventional Experience of Judges ...................................................................................11

     B.    None of the Remaining *Ellis* Factors Supports Application of the Primary Jurisdiction Doctrine ........................................22

CONCLUSION ....................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Axon v. Florida's Nat. Growers, Inc.*,
  813 F. App'x 701 (2d Cir. 2020) ........................................................10

*Backus v. Gen. Mills, Inc.*,
  122 F. Supp. 3d 909 (N.D. Cal. 2015).........................................23, 25

*DeCostanzo v. GlaxoSmithKline PLC*,
  643 F. Supp. 3d 340 (E.D.N.Y. 2022) ........................................17, 23

*Dist. of Columbia v. Beech-Nut Nutrition Co.*,
  No. 2021 CA 001292 B, 2023 WL 3880389 (D.C. Super. Ct. June
  5, 2023) .............................................................................................16

*Ellis v. Tribune Television Co.*,
  443 F.3d 71 (2d Cir. 2006) ....................................................3, 11, 22

*Gagetta v. Walmart, Inc.*,
  No. 3:22-CV-03757-WHO, 2022 WL 17812924 (N.D. Cal. Dec.
  19, 2022) ...........................................................................................10

*Gavilanes v. Gerber Prods. Co.*,
  No. 1:20-cv-05558, 2021 WL 5052896 (S.D.N.Y. Nov. 1, 2021) ....23

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000).........................................................................21

*Glob. Crossing Bandwidth, Inc. v. OLS, Inc.*,
  No. 05-cv-6423L, 2009 WL 763483 (W.D.N.Y. Mar. 19, 2009) .......7

*In re Edgewell Pers. Care Co. Litig.*,
  No. 16-cv-3371, 2018 WL 7858623 (Sept. 4, 2018)........................23

*In re Frito-Lay N. Am. Inc. All Nat. Litig.*,
  No. 12-MD-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) ....24

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
  No. 1:21-cv-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022).......16

*In re Plum Baby Food Litig.*,
   No. 4:21-CV-00913, 2023 WL 3493319 (N.D. Cal. May 3, 2023) .16, 17, 19, 23

*In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*,
   397 F. Supp. 3d 406 (S.D.N.Y. 2019) ...............................................10

*John v. Whole Foods Mkt. Grp., Inc.*,
   858 F.3d 732 (2d Cir. 2017) ..............................................................10

*Kimca v. Sprout Foods, Inc.*,
   No. BER-L-2538-22, 2022 WL 3586095 (N.J. Super. Ct. Aug. 5,
   2022) ...................................................................................................16

*Koenig v. Boulder Brands, Inc.*,
   995 F. Supp. 2d 274 (S.D.N.Y. 2014) ...............................................22

*McNulty v. Polar Corp.*,
   No. 19 Civ 8903, 2020 WL 5658667 (S.D.N.Y. Sept. 23, 2020).......23

*Medtronic v. Lohr*,
   518 U.S. 470 (1996)............................................................................22

*Palmer v. Amazon.com., Inc.*,
   51 F.4th 491 (2d Cir. 2022) .........................................................12, 19

*Paradowski v. Champion Petfoods, USA, Inc.*,
   No. 22-962-cv, 2023 WL 3829559 (2d Cir. June 6, 2023) ...........14, 18

*Petrosino v. Stearn's Prods., Inc.*,
   No. 16 -CV-7735, 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018)......24

*Physicians Comm. for Responsible Med. v. Gen. Mills, Inc.*,
   No. 1:05cv958, 2006 WL 3487651 (E.D. Va. Nov. 30, 2006)....23, 25

*Quidera v. Blackstone Labs*,
   No. 20-CV-80898, 2021 WL 4958789 (S.D. Fla. Mar. 8, 2021) .......23

*Rice-Sherman v. Big Heart Pet Brands, Inc.*,
   No. 19-CV-03613-WHO, 2020 WL 1245130 (N.D. Cal. Mar. 16,
   2020) ...................................................................................................10

*Robles v. Domino's Pizza, LLC*,
   913 F.3d 898 (9th Cir. 2019) .............................................................24

iii

*Silva v. Hornell Brewing Co.*,
    No. 20-cv-756, 2020 WL 4586394 (E.D.N.Y. Aug. 10, 2020) ......................... 23

*Solis v. Coty, Inc.*,
    No. 22-CV-0400, 2023 WL 2394640 (S.D. Cal. Mar. 7, 2023) ....................... 10

*Sulzer Mixpac AG v. A&N Trading Co.*,
    988 F.3d 174 (2d Cir. 2021) ................................................................. 8

*Tassy v. Brunswick Hosp. Ctr., Inc.*,
    296 F.3d 65 (2d Cir. 2002) ................................................................. 1

*Tribune Co. v. Abiola*,
    66 F.3d 12 (2d Cir. 1995) ................................................................... 7

*Williams v. Coca Cola Co.*,
    No. 8:15-CV-1534, 2017 WL 1214503 (N.D.N.Y. Mar. 31, 2017) .................. 21

*Wilson v. Walmart, Inc.*,
    No. 3:21-cv-82-DPM (E.D. Ark. Aug. 1, 2023), ECF No. 139 ......................... 6

iv

## INTRODUCTION

As this Court has recognized, the primary jurisdiction doctrine has two primary justifications – (1) the material need for agency expertise; and (2) the desire for uniformity of decisions between courts and the applicable agency. *See Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002).[1] In its response brief (ECF No. 57) ("Def. Br."), Defendant-Appellee, Beech-Nut Nutrition Co. ("Beech-Nut"), argues that there is a material need for the expertise of the U.S. Food & Drug Administration ("FDA") because "the gravamen of plaintiffs' claims is that Beech-Nut baby food is not safe to consume," and that – because the FDA is currently developing prospective, non-binding heavy metal action levels pertinent to baby foods – this case supposedly poses a "substantial danger of inconsistent rulings." Def. Br. at 20. These arguments – which grossly mischaracterize Plaintiffs' allegations and are based on several false premises – fail.

Preliminarily, Plaintiffs-Appellants ("Plaintiffs") will clarify the record. Plaintiffs' claims do ***not*** turn on whether the Beech-Nut baby foods at issue in this case (collectively, the "Baby Foods") are "safe to consume," nor do Plaintiffs contend, as Beech-Nut asserts, that "the underlying alleged toxicity of the products themselves is the cause of plaintiffs' alleged injuries." *Id*. at 20, 25. Rather, as pleaded in the Consolidated Amended Class Action Complaint ("Complaint"),

---

[1] Unless otherwise noted, citations are omitted and emphasis is added.

Plaintiffs allege wholly economic injuries, asserting that they would not have purchased, or would have paid less for, the Baby Foods had they known the truth – that is, that the Baby Foods contained or risked containing heavy metals. *See* Sections I & II.A, *infra*. Indeed, Plaintiffs' economic injuries are based on the proposition that they were unlawfully induced to purchase the Baby Foods by Beech-Nut's affirmative misrepresentations and material omissions with respect to, among other things, the presence or risk of heavy metals in the Baby Foods; the suitability of those foods for infants and small children; and the efficacy of Beech Nut's internal standards and testing for heavy metals in those foods. *Id.* The Complaint's allegations are unambiguous, and thus, the Court should summarily disregard Beech-Nut's transparent mischaracterizations as an unnecessary distraction.

Next, even assuming *arguendo* that the FDA's expertise is needed and inconsistent decisions must be avoided, the FDA already has established an action level of 100 ppb for inorganic arsenic in infant rice cereal. *See* Section I, *infra*. Underscoring the public concern regarding heavy metals in baby foods, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Subcommittee") issued two reports, documenting, *inter alia*, that Beech-Nut used ingredients in its Baby Foods that had high levels of toxic heavy metals; that Beech-Nut's internal safety standards were "far more permissive" than those of other baby food manufacturers and than "any

2

existing regulatory standard;" and that the State of Alaska tested samples of Beech-Nut's widely used Single Grain Rice Cereal ("Rice Cereal") and found "dangerously high" levels of inorganic arsenic above the FDA guidance in all of the samples tested. *See id.*, *infra*; *see also* ECF No. 41 ("Pltf. Br.") 13-16. This led Beech-Nut to recall some (but not all) of the Rice Cereal and then to discontinue selling its Rice Cereal entirely, admitting that it could not consistently obtain rice flour well-below the FDA guidance level of 100 ppb for inorganic arsenic. *See id.*[2] Beech-Nut's Rice Cereal is among the Baby Foods Plaintiffs were induced to purchase by Beech-Nut's misleading statements and material omissions. *See* Section I, *infra*. Therefore, the District Court erred in applying the primary jurisdiction doctrine to Plaintiffs' claims regarding inorganic arsenic in Beech-Nut's Rice Cereal because there is no pending agency action that permitted the District Court to cede its jurisdiction to the FDA. *See id.*; *see also* Pltf. Br. at 15-16, 35-36.

As to the remaining Baby Foods, the factors considered under *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006), do not support application of the

---

[2]  *See also* A-27, ¶5 (citing Subcommittee's February 4, 2021 report entitled, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury" ("Report")); A-28, ¶¶7-8, 153-55 (citing Subcommittee's June 8, 2021 supplemental report entitled, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods" ("Supplemental Rep.")); A-98-99, ¶¶153-55 (citing "Beech-Nut Nutrition Company Issues a Voluntary Recall of One Lot of Beech-Nut Single Grain Rice Cereal and Also Decides to Exit the Rice Cereal Segment").

primary jurisdiction doctrine. Plaintiffs' claims – for breach of warranty, fraud, negligence, unjust enrichment and violations of state consumer protection statutes – simply involve whether Beech Nut's false and misleading statements and omissions unlawfully induced Plaintiffs to purchase Beech-Nut's Baby Foods and raise matters unquestionably within the conventional experience of judges. *See* Section II.A, *infra*; *see also* Pltf. Br. at 31-43. Importantly, the FDA's Closer to Zero program will result in only prospective ***recommendations***, not mandatory regulations, and will not address the labeling of baby foods, and the FDA concedes that its forward-looking guidance is not intended to direct consumers in making food choices. *See* Section II.B, *infra*. Moreover, ***all*** the deadlines the FDA initially set for establishing the relevant action levels have slipped. *See id*. To date, the FDA has only established draft guidance for one of the four heavy metals at issue in this case (lead); and there is currently ***no*** deadline for final action on ***any*** of the relevant heavy metals. *See* Pltf. Br. at 22-23. Thus, the FDA's Closer to Zero program cannot and will not resolve the disclosure issues in this case. *See id*. at 43-47. In short, none of the *Ellis* factors support application of the primary jurisdiction doctrine.

Accordingly, the Court should reject Beech-Nut's effort to indefinitely delay this action to await FDA guidance, which, in the case of inorganic arsenic in infant rice cereal, already exists, and which in any event, is unnecessary to a decision in this consumer protection action because – even when complete – any such

prospective, non-binding guidance will not materially assist the District Court in deciding issues relating to the false and misleading disclosures in this case. Thus, the Court should reverse the District Court's dismissal order. SPA-1-13.

## **ARGUMENT**

## I.     **THE PRIMARY JURISDICTION DOCTRINE IS INAPPLICABLE TO PLAINTIFFS' CLAIMS RELATING TO INORGANIC ARSENIC IN BEECH-NUT'S RICE CEREAL**

The major premise underlying Beech-Nut's primary jurisdiction defense is, as the District Court stated, that "resolving plaintiffs' claims first requires a determination on whether the levels of heavy metals in Beech-Nut's products is [*sic*] harmful, which is within the FDA's field of expertise." SPA 9-10. Thus, Beech-Nut argues Plaintiffs' claims should be stayed until the FDA – at some indeterminate time in the future – arrives at action levels pertaining to the heavy metals at issue here: arsenic, lead, cadmium, and mercury. *See generally* Def. Br. As a preliminary matter, the premise that Plaintiffs' claims cannot be resolved until the FDA sets specific action levels is based on a mischaracterization of Plaintiffs' allegations, and thus, fails. *See* Section II.A., *infra*. Even assuming *arguendo* though that an action level is necessary, the District Court erred in applying the primary jurisdiction doctrine to Plaintiffs' claims relating to inorganic arsenic in Beech-Nut's Rice Cereal because an FDA action level for inorganic arsenic and infant rice cereal already exists. *See* Pltf. Br. at 13-16, 35-36.

As of August 20, 2020, the FDA established an action level of 100 ppb for inorganic arsenic in infant rice cereal products. A-91-92, ¶131 & n.46. Plaintiffs allege that in September 2021, the Subcommittee reported that the State of Alaska tested samples of Beech-Nut Rice Cereal and found that ***all of the samples*** tested were contaminated with "dangerously high" levels of inorganic arsenic above the FDA's 100 ppb action level. A-27, 98-99, ¶¶7, 153. As a result, Beech-Nut recalled certain lots of its Rice Cereal and then completely discontinued selling its Rice Cereal, admitting that it could not consistently obtain rice flour well-below the FDA guidance level of 100 ppb for inorganic arsenic. A-99, ¶154 & n.87. Thus, the FDA has established the relevant action level with respect to inorganic arsenic and infant rice cereal[3] and governmental testing of Beech-Nut Rice Cereal demonstrates that Beech-Nut violated the action level. Accordingly, there is no impending regulatory action that could justify the District Court ceding jurisdiction to the FDA on Plaintiffs' claims relating to inorganic arsenic and infant rice cereal. *See Wilson v.*

---

[3]     Beech-Nut attempts to sow confusion, suggesting that the FDA intends to develop additional action levels relating to inorganic arsenic in baby foods. Specifically, it claims that the "FDA is continuing to evaluate the science to establish interim reference levels for ***inorganic arsenic*** . . . and projects that it will have draft guidance available for interagency review in 2024" and argues that "[o]nly upon completion of FDA's work will there be a proper scientific record[.]" Def. Br. at 42-43; *see also id. at* 15. However, as discussed, an FDA action level pertaining to ***inorganic*** arsenic in infant rice cereal already exists, and the Closer to Zero document that Beech-Nut cites generically references "arsenic" – ***not*** inorganic arsenic. Def. Br. 43 n.15 (citing Closer to Zero, https://tinyurl.com/22kmtmbf).

*Walmart, Inc.*, No. 3:21-cv-82-DPM (E.D. Ark. Aug. 1, 2023), ECF No. 139 (in an analogous case against a different baby food seller, the court denied the motion to dismiss on primary jurisdiction grounds in part, permitting "[a]ll claims about inorganic arsenic in infant rice cereals [to] go forward," albeit (incorrectly) staying the plaintiffs' claims regarding heavy metals in other products).

Without disputing this, Beech-Nut asserts that it would be "inefficient and imprudent" to "carve-out" Plaintiffs' allegations relating to "excessive levels" of inorganic arsenic in infant rice cereal because this case "constitutes a portfolio-wide attack on heavy metals" and because Beech-Nut's defenses are likely to "overlap and hinge on future determinations from FDA." Def. Br. at 30. Again, no "future determination" from the FDA is forthcoming as to levels of inorganic arsenic in infant rice cereal. Beech-Nut cites no authority to support its contention that a district court – based on unspecified assertions of "inefficiency" and "overlap" – can dismiss claims based on "primary jurisdiction" where the doctrine clearly does not apply. To the contrary, "'only under exceptional circumstances' may federal courts eschew their duty 'to exercise jurisdiction over all cases properly before them.'" *Tribune Co. v. Abiola*, 66 F.3d 12, 17 (2d Cir. 1995). Application of the primary jurisdiction doctrine is the "exception, not the norm," and thus, should not be "lightly invoked." *Glob. Crossing Bandwidth, Inc. v. OLS, Inc*., No. 05-cv-6423L, 2009 WL 763483, at *2 (W.D.N.Y. Mar. 19, 2009).

Beech-Nut then points out that "[t]here are no allegations that any plaintiff purchased a product that was subject to a recall" and asserts that Plaintiffs' Rice Cereal claims are "admittedly hypothetical" because it is only "theoretically possible that rice cereal with levels of inorganic arsenic could have possibly been sold in the past." Def. Br. at 31. Beech-Nut's arguments are premature and misguided, and therefore, must be rejected. Preliminarily, because the District Court dismissed the Complaint on primary jurisdiction grounds this Court can disregard Beech-Nut's implicit invitation to undertake a Rule 12(b)(6) analysis. *See Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 184 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1359 (2022) (remarking that this Court "generally refrain[s] from considering issues not decided by the district court"). Moreover, to the extent the Court considers this line of argument, Plaintiffs' allegations are concrete and plausible, not hypothetical and theoretical, and sufficient to confer Article III standing (which Beech-Nut challenges in a footnote). *See* Def. Br. at 31 & n.12.

The Complaint specifically alleges that at least 28 of the named Plaintiffs purchased and routinely fed their children Beech-Nut's Rice Cereal.[4] And, Plaintiffs allege that they would not have purchased, or would have paid less for, the Baby Foods (which includes the Rice Cereal) if they had known the products contained *or*

---

[4]     *See*, *e.g.*, A-31-71, ¶¶18, 20, 24, 25, 26, 34, 35, 36, 38, 42, 45, 46, 49, 53, 56, 58, 60, 61, 64, 66-68, 70-71, 74, 76, 79, 83.

8

*risked containing* heavy metals. *See, e.g.*, A-71, 106, 112, 134, 136, 138, 141-42, 144, 209, ¶¶85, 179, 203, 315, 325, 336, 348, 354, 366, 677-78. Moreover, Plaintiffs' claims (which, again, are not personal injury claims) are not founded on injuries related to the "recall" but rather on Beech-Nut's misrepresentations and material omissions concerning the wholesomeness of its Baby Foods, the stringency of its internal standards, and the efficacy of its testing, including specifically as to Beech-Nut's Rice Cereal. *See, e.g.*, A-28-29, 71, 88, 135-36, 140, ¶¶9-12, 85, 119-21, 323-24, 345-46. In short, Plaintiffs allege that *all* the Baby Foods are falsely warranted and advertised. Yet, Beech-Nut asserts that Alaska's testing found elevated arsenic levels across "only six" Beech-Nut "product codes," insinuating that the elevated levels of inorganic arsenic in its Rice Cereal was not widespread. Def. Br. at 31, n.11. Beech-Nut's quibbling over the scope of the Rice Cereal contamination, however, is a distraction from the more important point that Beech-Nut ultimately *stopped selling the product entirely* – in the immediate aftermath of the limited recall – because it could not reliably source the main ingredient – rice – with inorganic arsenic levels below the FDA guidance. A-99, ¶154 & n.87. Beech-Nut's public admission that its product could not meet FDA action levels directly supports Plaintiffs' allegations that Beech-Nut made misrepresentations and material omissions with respect to the wholesomeness of its Baby Foods, the

effectiveness of its testing, and the strictness of its internal standards.[5]  Considering

the foregoing allegations together and drawing all inferences in Plaintiffs' favor, as

the Court must, Plaintiffs' allegations are sufficient to confer Article III standing.

*See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737-38 (2d Cir. 2017); *Axon*

*v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 703-04 (2d Cir. 2020); *Solis v.*

*Coty, Inc.*, No. 22-CV-0400, 2023 WL 2394640, at *11 (S.D. Cal. Mar. 7, 2023);

*Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-CV-03613-WHO, 2020 WL

1245130, at *6–7 (N.D. Cal. Mar. 16, 2020); *Gagetta v. Walmart, Inc.*, No. 3:22-

CV-03757-WHO, 2022 WL 17812924, at *4-6 (N.D. Cal. Dec. 19, 2022).[6]

Thus, the District Court erred in applying the primary jurisdiction doctrine to

dismiss Plaintiffs' claims relating to inorganic arsenic and infant rice cereal.

---

[5]    It is ironic that Beech-Nut emphasizes that product testing (as opposed to ingredient-only testing)  is required to determine whether a product is "safe and not adulterated" (Def. Br. at at 30 & n.10) and criticizes Plaintiffs for pleading ingredient contamination since Plaintiffs allege that the Subcommittee found that Beech-Nut's ***own ingredient-only testing*** (which is what Plaintiffs' relied on in the Complaint) was flawed because the company did not test finished products, concluding that this "appears to have contributed to [Beech-Nut's] failure to detect the dangerous inorganic arsenic levels in its recalled [Rice Cereal] products." A-99; ¶156.

[6]    In Beech-Nut's cited cases (Def. Br. at 31 n.12), unlike here, the plaintiffs failed to allege that all the products were falsely advertised.  Furthermore, *In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 397 F. Supp. 3d 406 (S.D.N.Y. 2019), was decided on summary judgment and thus is procedurally inapposite.

## II.  THE *ELLIS* FACTORS DO NOT SUPPORT APPLICATION OF THE PRIMARY JURISDICTION DOCTRINE

The applicability of the primary jurisdiction doctrine turns on the following four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis*, 443 F.3d at 82-83.  As thoroughly discussed in Plaintiffs' opening brief, none of the *Ellis* factors supports application of the primary jurisdiction doctrine in this case (Pltf. Br. at 31-49), and Beech-Nut's arguments do not support a contrary conclusion.

### A.  Plaintiffs' Claims Are Within the Conventional Experience of Judges

Plaintiffs' breach of warranty, fraud, negligence, unjust enrichment, and consumer protection claims present legal and factual issues that judges deal with every day.  *Id*. at 31-43.  Thus, to convince the Court that these issues are outside the conventional experience of judges, Beech-Nut mischaracterizes Plaintiffs' claims.  Beech-Nut falsely contends that Plaintiffs' Complaint "is wholly dependent on assertions that the products as currently permitted to be sold by the FDA are 'unsafe' and unsuitable to consume, and that *the underlying alleged toxicity of the*

11

***products themselves is the cause of plaintiffs' alleged injuries***."  Def. Br. at 25

(quoting ¶12 of the Complaint (A-29)).[7]  The Complaint, however, says the opposite:

> Baby food that contains or materially risks containing heavy metals that bioaccumulate in infants and children, who generally cannot eat a balanced variety of different foods to minimize the impact of heavy metal bioaccumulation, ***is not what Plaintiffs and the Class and Subclasses bargained for and is, in fact, worthless. The presence and risk of toxic heavy metals rendered the Beech-Nut Baby Foods unfit for their intended purpose and use, defective and worthless, and denied consumers the benefit of their bargain.***

A-29, ¶12.  Thus, contrary to Beech-Nut's assertion that the "toxicity of the [baby

food] products themselves is the cause of plaintiffs' alleged injuries," those injuries

– which are economic, not physical – arose when Plaintiffs were induced to purchase

the Baby Foods by Beech-Nut's misrepresentations and material omissions with

respect to "the presence and risk of toxic heavy metals" in its Baby Foods; the

suitability of those foods for infants and small children; and the efficacy of its

---

[7]     An amicus brief filed by several organizations (the "Amici") engages in a similar, albeit slightly different, mischaracterization.  *See* ECF No. 62-2 ("Amicus Br.").  The Amici assert that Plaintiffs' "basic contention . . . is that the trace presence of heavy metals in the food supply, including in baby foods, mandates some affirmative change to their labels[.]"  Amicus Br. at 4.  To the contrary, Plaintiffs' "basic contention" is that they were misled into purchasing products that they otherwise would not have purchased by Beech-Nut's numerous materially false and misleading statements and omissions – *i.e.*, classic consumer protection claims of the sort that judges deal with all the time.  The fact that Plaintiffs seek various forms of equitable relief in addition to damages, *see* A-292-94, does not alter the fundamental nature of this action.  *See Palmer v. Amazon.com., Inc.*, 51 F.4th 491, 507-08 (2d Cir. 2022) (the "possible scope of [equitable] relief do[es] not transform the traditional state tort law questions before us into issues requiring [agency expertise]" for purposes of primary jurisdiction).

supposed product testing and its purportedly stringent internal standards regarding heavy metals in its Baby Foods. *See, e.g.*, A-28-29, 71, 88, 135-36, 140, ¶¶9-12, 85, 119-21, 323-24, 345-46. Importantly, Plaintiffs allege they would not have purchased or would have paid less for the Baby Foods had they known the products contained or risked containing heavy metals. *See, e.g.*, A-71, 106, 112, 134, 136, 138, 141-42, 144, 209, ¶¶85, 179, 203, 315, 325, 336, 348, 354, 366, 677-78. In other words, regardless of whether the FDA promulgates action levels in the future for heavy metals in baby foods, Plaintiffs' injuries occurred and were entirely completed the moment Plaintiffs were unlawfully induced to purchase Beech-Nut's Baby Foods by Beech-Nut's misrepresentations and material omissions.

Beech-Nut contends that – absent proof that the heavy metals in Beech-Nut's Baby Foods exceed FDA action levels (which currently are non-existent except for inorganic arsenic in infant rice cereal) – Plaintiffs did get the benefit of their bargain, and therefore, "the heart of this case is whether the challenged products are safe to consume." Def. Br. at 25. In fact, however, the "heart of this case" is whether Beech-Nut – to exploit obvious concerns that parents have for their children's safety – sought to profit, *inter alia*, by omitting material facts regarding the presence and risk of heavy metals in the Baby Foods and by misrepresenting the rigor of its internal standards and the thoroughness of its testing in order to create the false impression that the risks posed by heavy metals were minimized in its Baby Foods.

13

*See, e.g.*, A-82-85, 97-99, 102-05, ¶¶108-13, 149-57, 168-75.[8]  Beech-Nut did this

despite its awareness that its products had been independently found to contain

concerning levels of heavy metals.  A-100-02, ¶¶158-67.  Plaintiffs were injured

because "[b]aby food that contains or materially risks containing heavy metals that

bioaccumulate in infants and children . . . is not what Plaintiffs . . . bargained for and

is, in fact worthless."  A-29, ¶12.

In short, a scientific determination about the lowest permissible levels for

specific heavy metals in baby foods is not necessary to resolve Plaintiffs' claims.

All that is required is the application of well-established tort, contract, and statutory

principles to determine whether Beech-Nut breached its warranties and made

---

[8]     Beech-Nut argues that "[i]f plaintiffs are really only alleging a garden-variety omission claim for failing to disclose the presence of heavy metals," that claim would be barred by *Paradowski v. Champion Petfoods, USA, Inc.*, No. 22-962-cv, 2023 WL 3829559, at *2-3 (2d Cir. June 6, 2023) (summary order).  Def. Br. at 24 n.7.  However, as Beech-Nut well-knows, Plaintiffs assert claims based on both omissions and affirmative misrepresentations.  *See, e.g.*, A-82-84, ¶¶108-12. Moreover, the claims in *Paradowski* were based on N.Y. Gen. Bus. Law § 349, which the New York courts have interpreted to require a showing that "the business alone possesses material information that is relevant to the consumer and failed to provide this information."  2023 WL 3829559, at *2.  The Court affirmed the district court's finding that the relevant information – which involved the presence of heavy metals in dog food (not baby food) – was publicly available and therefore was not something that the "business alone possesses."  *Id.*, at *3.  The same cannot be said in this action.  Further, although the New York Plaintiff and Subclass assert claims pursuant to N.Y. Gen. Bus. Law §349, *see* A-237-39, ¶¶808-19, they also assert common law claims under New York law, and the remaining plaintiff classes assert claims based on other state common laws and consumer protection statutes, some of which have differing legal elements.  *See, e.g.*, A-128-60.

misleading statements and material omissions calculated to induce Plaintiffs to purchase its Baby Foods, despite knowing that its Baby Foods contained, or risked containing, toxic heavy metals, which, in many cases, not only exceeded applicable and analogous action levels for heavy metals, but also exceeded its own internal standards.[9]

Plaintiffs allege that it is well-established that heavy metals are toxic and that they bioaccumulate, especially in infants and small children, so that even very small amounts can, over time, pose serious health risks. A-89-90, ¶¶122-27. Thus, as alleged, it was material to Plaintiffs to know they were not exposing their children to such unnecessary risks – *i.e.*, that Beech-Nut (as it claimed) had set strict internal standards for its Baby Foods, that it was conducting appropriate tests, and that it was taking available steps to minimize the presence of such heavy metals in its Baby Foods, regardless of any determination by the FDA with respect to action levels for the particular heavy metals. A-73-75, 82-85, 87-88, 105-06, ¶¶91-95, 107-13, 118,

---

[9]    *See, e.g.*, A-82-84, ¶¶108-11 (Beech-Nut's false claim that its testing of baby foods for heavy metals "[went] above and beyond" standard testing practices in the industry); A-84, ¶112 (false claim that pertinent government standards are "not good enough" for Beech-Nut); A-82, ¶106 (failure to disclose "the presence of toxic heavy metals or that [Beech-Nut's] Baby Foods may contain toxic heavy metals"). In fact, as the Subcommittee's Report found, Beech-Nut's internal standards were "uniquely permissive amongst baby food manufacturers, and allowed for levels of toxic heavy metals that 'far surpass any existing regulatory standards . . . and toxic heavy metal levels for any other [responding] baby food manufacturer,'" and yet sold baby foods that exceeded its own internal standards. A-98, 104, ¶¶151, 174.

176-79.  Thus, Beech-Nut's mischaracterization notwithstanding, Plaintiffs' claims are within the conventional experience of judges to resolve.  *See* Pltf. Br. at 31-43.

Beech-Nut's other arguments in support of its position that this case poses issues that are beyond the conventional experience of judges are similarly unconvincing.

Beech-Nut first relies heavily on two non-precedential trial court decisions – *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 1:21-cv-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022) ("*Gerber*") and *Kimca v. Sprout Foods, Inc.*, No. BER-L-2538-22, 2022 WL 3586095 (N.J. Super. Ct. Aug. 5, 2022) ("*Kimca*") – that are unpersuasive.[10]  As Plaintiffs explained in their opening brief, these decisions are at odds with *In re Plum Baby Food Litig.*, No. 4:21-CV-00913, 2023 WL 3493319 (N.D. Cal. May 3, 2023).  Pltf. Br. at 28-30.  The *Plum* court refused to apply the primary jurisdiction doctrine in an analogous case based on its findings, which are equally applicable here, that: (1) the FDA's Closer to Zero initiative will not address the labeling of baby food products or manufacturers' obligation to

---

[10]    Beech-Nut fails to cite another, similar decision, *Dist. of Columbia v. Beech-Nut Nutrition Co.*, No. 2021 CA 001292 B, 2023 WL 3880389, at *3 (D.C. Super. Ct. June 5, 2023) (applying the primary jurisdiction doctrine where plaintiffs relied on Beech-Nut's "internal testing standard ***to show that Defendant's products are allegedly high in toxic heavy metals***").  Here, Plaintiffs allege that – in assessing the risks posed by the Baby Foods – they were misled by Beech-Nut's false statements, *inter alia*, about the stringency of its internal testing standards.  A-82, 85, 103-06, ¶¶108-13, 171-79.

16

disclose the potential presence of heavy metals in baby foods; (2) while the FDA's Closer to Zero initiative is geared toward establishing a forward-looking rule, the plaintiffs' claims primarily involved the defendant's past conduct; and (3) the FDA's proposed action levels – even if established at some indefinite time in the future – would not be mandatory, but rather would only be non-binding recommendations, which "is not an adequate basis for staying an action under the primary jurisdiction doctrine." *Plum Baby Food Litig*., 2023 WL 3493319, at *1-2.[11]

Also, as Plaintiffs discussed in their opening brief, when *Gerber* and *Kimca* were decided, the courts in those cases had reason to expect that the FDA would establish the relevant action levels within the deadlines set by the FDA in its original Closer to Zero announcement. Pltf. Br. at 6-7, 21-23, 33-35. Since then, those deadlines have been pushed back to the point that now – two years into the initiative – ***no standards have been established***. *Id*. Thus, awaiting the FDA's prospective, non-binding guidance will lead to delay that is much longer than the *Kimca* and *Gerber* courts had reason to expect.[12]

---

[11]     Courts in the Second Circuit have stated that "the primary jurisdiction doctrine 'is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit.'" *See, e.g., DeCostanzo v. GlaxoSmithKline PLC*, 643 F. Supp. 3d 340, 350 (E.D.N.Y. 2022).

[12]     Indeed, as Beech-Nut discusses, the FDA may never complete its work on the relevant action levels. *See* Def. Br. at 29 (describing the FDA's iterative process, where – once FDA establishes action levels – it will "monitor and enforce the action levels that it sets" and "will reduce levels of heavy metals in food by 'increasing

17

Curiously, Beech-Nut begins its brief with a quote from this Court's recent *Paradowski* decision, highlighting that "it is not within the province of the courts to decide what information must be disclosed on consumer packaging," and that such issues are for "Congress or a federal agency such as the FDA to determine." Def. Br. at 1 (quoting *Paradowski*, 2023 WL 3829559, at *3). Yet, the FDA's Closer to Zero initiative will ***not*** result in labeling standards. Pltf. Br. at 18-19 (citing sources). Indeed, the Amici admit in their brief that "action levels are not intended to direct ***consumers'*** decisions on food," but rather "are intended to guide ***manufacturers*** . . . on the acceptable levels of heavy metals in baby foods." Amicus Br. at 16 (emphasis in original). Accordingly, the relief sought in this case (whether monetary or equitable) will not be inconsistent with the outcome of the FDA's Closer to Zero initiative, because it is directed at different persons and entities and has different objectives. *See* Pltf. Br. at 36-38, 45-46.

Beech-Nut's quotation of *Paradowski* appears to be directed toward the portion of Plaintiffs' 12-part "Prayer for Relief," which seeks an order either "enjoining Defendant from selling the Beech-Nut Baby Foods until the elevated levels of heavy metals are removed or full disclosure of the presence of such appears on all labels, packaging, and advertising." A-292-94. Notwithstanding Plaintiffs'

---

targeted compliance and enforcement activities.'"); *see also* Amicus Br. at 12-15 (admitting that "[f]or more than 30 years, the FDA had been 'working to reduce exposure to lead and other environmental contaminants, from foods").

comprehensive Prayer for Relief, this case is primarily focused on recovering damages for past injuries based on Beech-Nut's past conduct. As this Court recognized in *Palmer*:

> [T]he possible scope of [injunctive] relief [does] not transform the traditional state tort law questions before us into issues requiring OSHA's technical and policy expertise. Before relief can be fashioned, questions of injury, duty and breach must be addressed. These questions, including whether the relief requested exceeds that warranted by the injuries alleged, are squarely within a district court's bailiwick.

51 F.4th at 507-08 (reversing district court's abstention based on primary jurisdiction); *see also Plum Baby Food*, 2023 WL 3493319, at *1-2 (stating that although plaintiffs sought injunctive relief, the case turned primarily on "past conduct"). The same is true here.

Beech-Nut – without disputing that Closer to Zero will not result in labeling changes – claims that "FDA's ongoing work will be highly relevant" because it will "inform whether and to what extent the risk of trace amounts of naturally occurring heavy metals in baby foods is acceptable." Def. Br. at 32. Beech-Nut fails to cite any legal authority for this contention. Instead, Beech-Nut slyly presents as true several disputed points – specifically, the propositions that: (1) only "trace amounts" of heavy metals are in Beech-Nut's Baby Foods, an assertion that Beech-Nut repeatedly makes in its brief (*id.* at 2, 10, 11, 20, 34, 37, 42); and (2) such heavy metals are "naturally occurring." *Id.* at 1, 4, 10, 11, 32. The Amici parrot these same

19

points. *See, e.g.*, Amicus Br. at 3-5, 8, 13. Yet, nothing in Plaintiffs' Complaint supports that this case is about purportedly trace levels heavy metals. Instead, the case clearly seeks to hold Beech-Nut accountable for knowingly selling baby foods containing (or having a material risk of containing) elevated levels of toxic heavy metals, and despite having actual knowledge of this fact, did not disclose to consumers the presence or risk of toxic heavy metals in its Beech-Nut Baby Foods or that Beech-Nut lacked adequate testing and safety standards. *See, e.g*., A-27-29, ¶¶5-13. Also, Plaintiffs allege that Beech-Nut uses ***additives*** in its Baby Foods (which are not "naturally occurring") that also contain heavy metals (A-97, ¶150 ("Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic[.]")) and that baby foods can be manufactured to reduce the levels of heavy metals. A-106-09, ¶¶182-92. Beech-Nut's frequent use of flagrantly minimizing language is unavailing when juxtaposed against Plaintiffs' actual allegations.

Purporting to speak for the FDA, Beech-Nut next contends – without citation of authority – that the "FDA is reiterating that the presence of heavy metals in baby food should ***not*** be a factor in determining what food children should eat;" that "warning labels certainly have no place on what FDA considers safe and nutritious food;" and that the "FDA does not want consumers to be concerned about action levels or to make purchasing decisions based on action levels." Def. Br. at 33 (emphasis in original). Then – having anointed itself to speak for the FDA – Beech-

Nut ironically accuses Plaintiffs of an "attempt to commandeer FDA's role to regulate food safety and food labeling under the guise of state consumer protection laws," and claims that this lawsuit is "preempted because it conflicts with federal law and supremacy." *Id. at* 33-34. Beech-Nut appears (without specifying) to suggest that conflict preemption exists. *See id*. at 33-34 & n.13. Yet, Beech-Nut fails to identify any federal laws that conflict with Plaintiffs' claims, and, in fact, there are no such laws. Except for inorganic arsenic in rice cereals (discussed above), the FDA has not yet set any "action levels" for heavy metals in baby foods; indeed, that is the purported basis for Beech-Nut's primary jurisdiction argument. And, as to the FDA's action level for inorganic arsenic in rice cereals, nothing in this case is inconsistent with that level. Beech-Nut, therefore, must rely on the wildly overbroad proposition that "*[w]here a federal regulatory agency like FDA regulates in an area of its expertise . . . state law may not be used to bar conduct the agency has chosen not to prohibit.*"[13] This is not the law. Indeed, food safety is an area that has traditionally been reserved for state regulation, s*ee Williams v. Coca Cola Co.*, No. 8:15-CV-1534, 2017 WL 1214503 (N.D.N.Y. Mar. 31, 2017),

---

[13]     Def. Br. at 34, n.13 (emphasis added). Beech-Nut cites *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000) for this proposition. *Id*. There, the Supreme Court held that state tort claims that would, in effect, compel all new cars to install airbags conflicted with a Department of Transportation rule, which, as a matter of federal policy, expressly provided for a mix of passive restraint devices to be used in new cares. The other cases cited by Beech-Nut, *id*., are both non-binding and inapposite.

and, as a result, there is a strong "presumption against preemption" when federal agencies seek to regulate in that area. *See Medtronic v. Lohr*, 518 U.S. 470, 485 (1996).

Thus, even if the FDA had announced action levels relevant to this case (which it has not), and even if Plaintiffs sought relief inconsistent with those levels (which they do not), Plaintiffs' claims would not be preempted because action levels are merely non-binding advisory guidance of the sort that cannot support preemption. *See, e.g., Koenig v. Boulder Brands, Inc*., 995 F. Supp. 2d 274, 285-86 (S.D.N.Y. 2014) (FDA's non-binding "advisory opinions" are "not entitled to preemptive effect"). In sum, federal preemption has no application here.

In sum, Beech-Nut's arguments fail to rebut the conclusion that the issues relating to Plaintiffs' claims are well within the conventional experience of judges to decide without ceding jurisdiction to the FDA.

### B. None of the Remaining *Ellis* Factors Supports Application of the Primary Jurisdiction Doctrine

The remaining *Ellis* factors – whether the issues are "particularly within the agency's discretion," the danger of "inconsistent rulings," and whether there has been "prior application to the agency," *see Ellis*, 443 F.3d at 82-83 – do not support application of the primary jurisdiction doctrine in this case.

First, it is undisputed that the FDA has responsibilities with respect to food safety and labeling. *See* Pltf. Br. at 43; Def. Br. at 35-36. This case, however, does

not present the scientific issues that were found to justify application of the primary jurisdiction doctrine in the cases Beech-Nut cites. *See* Def. Br. at 35-36.[14] Indeed, the FDA's prospective, recommended action levels will not materially assist any court in resolving, for example, whether Beech-Nut's past statements and omissions in marketing its Baby Foods were materially false and misleading or whether Plaintiffs were likely to be deceived. *See* Pltf. Br. at 40-43. As many courts have found, primary jurisdiction is inappropriate in cases involving such commonplace legal issues. *See Plum Baby Food*, 2023 WL 3493319, at *1-2 ("The Court need not rely on the FDA's expertise or its potential guidance on action levels [for heavy metals in baby food] to determine whether [defendant's] alleged omissions are actionable given the allegations of the operative complaint").[15] As this case

---

[14] Those cases also are distinguishable for other reasons. *See Physicians Comm. for Responsible Med. v. Gen. Mills, Inc.*, No. 1:05cv958, 2006 WL 3487651, at *6 (E.D. Va. Nov. 30, 2006), *aff'd*, 283 F. App'x 139 (4th Cir. 2006) (before filing their complaint, plaintiffs had filed "two closely related administrative petitions" with the FTC and the FDA); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 934 (N.D. Cal. 2015), *appeal dismissed*, No. 15-16658 (2d Cir. Jan. 26, 2016) (FDA "explicitly encouraged the food industry to submit petitions for review of trans fats as a food additive;" the defendant had done so; and FDA was considering); *Quidera v. Blackstone Labs*, No. 20-CV-80898, 2021 WL 4958789, at *1-2 (S.D. Fla. Mar. 8, 2021) (allegation that ingredient was "illegal" was a basis for each claim; FDA had "expressed interest" in the issue, but not taken "final agency action").

[15] *See also DeCostanzo*, 643 F. Supp. 3d at 350; *Silva v. Hornell Brewing Co.*, No. 20-cv-756, 2020 WL 4586394, at *2 (E.D.N.Y. Aug. 10, 2020), *Gavilanes v. Gerber Prods. Co.*, No. 1:20-cv-05558, 2021 WL 5052896, at *3 (S.D.N.Y. Nov. 1, 2021); *McNulty v. Polar Corp.*, No. 19 Civ 8903, 2020 WL 5658667, at *6-7 (S.D.N.Y. Sept. 23, 2020); *In re Edgewell Pers. Care Co. Litig.*, No. 16-cv-3371,

proceeds, it is axiomatic that expert evidence can provide any scientific explanations that may be required.  *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 911 (9th Cir. 2019).

Second, there is no danger of "inconsistent rulings" because:  (1) this case (as discussed) does not require the application of scientifically precise action levels, like those that are the subject of the FDA's Closer to Zero initiative; (2) those action levels, once established, will be non-binding and purely prospective in their application, unlike Plaintiffs' claims here, which are primarily focused on Plaintiffs' past economic injuries; (3) the FDA will not address labeling or disclosure issues in connection with its Closer to Zero initiative; (4) with respect to Plaintiffs' claims based on purchases of Beech-Nut's Rice Cereal, there is an existing action level, which Beech-Nut has been found to have violated; and (5) no matter what action levels the FDA may ultimately set for lead, cadmium, mercury, and arsenic in other baby food products, that will not implicate Plaintiffs' past economic injuries in this case, which were complete at the time Beech-Nut misleadingly induced Plaintiffs' to purchase its Baby Foods.  *See* Pltf. Br. at 45-46.

---

2018 WL 7858623, at *5-6 (Sept. 4, 2018); *Petrosino v. Stearn's Prods., Inc*., No. 16-CV-7735, 2018 WL 1614349, at *10 (S.D.N.Y. Mar. 30, 2018); *In re Frito-Lay N. Am. Inc. All Nat. Litig*., No. 12-MD-2413, 2013 WL 4647512, at *8 (E.D.N.Y. Aug. 29, 2013).

Finally, neither party has sought to resolve the legal claims in this case through any "prior application" to the FDA. *Id. at* 47. Beech-Nut argues that the Subcommittee's Report, in effect, constitutes a "prior application" to the FDA. Def. Br. at 47. There is, however, a clear difference between a party to a lawsuit calling on the FDA to decide an issue that bears directly on the conduct that is the subject of the litigation (which **has not** occurred here),[16] and the FDA – based on Congressional fact-finding – developing general, forward-looking advisory guidance, as is occurring in connection with the FDA's Closer to Zero initiative. In short, the FDA's Closer to Zero initiative will not materially assist any court in resolving the legal issues in this case.

Thus, each of the remaining *Ellis* factors weighs against application of the primary jurisdiction doctrine.

## CONCLUSION

In conclusion, the *Ellis* factors weigh against application of the primary jurisdiction doctrine. Thus, Plaintiffs respectfully request that the Court reverse the District Court's order dismissing this action and remand the case for further proceedings.

---

[16] That was the case in two of the cases Beech-Nut cites. *See Physicians Comm. for Responsible Med.,* 2006 WL 3487651, at *6; *Backus,* 122 F. Supp. 3d at 934.

Dated:    September 22, 2023        Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT
LAW LLP

By:    */s/ Erin Green Comite*
Erin Green Comite
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
ecomite@scott-scott.com

Steven L. Bloch
SILVER GOLUB & TEITELL LLP
One Landmark Square
15th Floor
Stamford, CT 06901
Tel.: (203) 325-4491
Fax: (203) 325-3769
sbloch@sgtlaw.com

***Counsel for Plaintiffs-Appellants
and Consolidated Plaintiffs-
Appellants***

26

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,631 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: Colchester, Connecticut
September 22, 2023